Non-Confidential

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

CEK GROUP LLC

            Plaintiff,

   v.

UNITED STATES,

            Defendant,

  and

M&B METAL PRODUCTS COMPANY, INC.,

         Defendant-Intervenor.

Court No. 22-00082

Before: Jane A. Restani, Judge

## MEMORANDUM OF LAW IN SUPPORT OF THE RULE 56.2 MOTION OF PLAINTIFF CEK GROUP LTD FOR JUDGMENT UPON THE AGENCY RECORD

David J. Craven, Esq.
CRAVEN TRADE LAW LLC
3744 N Ashland Avenue
Chicago, Illinois 60613
Tel. 773-709-8506
David.craven@tradelaw.com
    Counsel for Plaintiff

Dated: September 12, 2022

## Table of Contents

Table of Contents ................................................................................................................. i

Table of Authorities ........................................................................................................... iii

I.    Introduction ................................................................................................................1

II.    Statement Pursuant to Rule 56.2(C) ........................................................................2

    A.    The Administrative Determination Under Review ...................................2

    B.    Issues of Law .............................................................................................2

    C.    Summary of Arguments ..............................................................................3

    D.    Statement of Facts .....................................................................................4

III.    Standard of Review ...................................................................................................7

IV.    Argument .................................................................................................................10

    A.    The Allegation Does Not Support Initiation of the Investigation ...........10

        1.    The Regulatory Criteria are not Satisfied ...................................10

        2.    No Evidence that Garment Hangers from NWH were Likely Made in China ...................................................................................14

        3.    The Number of Importers of Garment Hangers from Thailand is Irrelevant ....................................................................................20

        4.    Allegers Claim of Substantial Unpaid Duties is Based on Faulty Assumptions .................................................................................20

        5.    The Market Research Report Contains No Evidence of Evasion and Contains Evidence of Production .................................................21

    B.    CBP Improperly Rejected Video Evidence Presented by NWH ............28

    C.    Even if the Allegation were Adequate, there is no Substantial Evidence of Evasion ...................................................................................................29

        1.    Certain Information Not Supplied Irrelevant to CBP's Analysis .............29

        2.    Information Supplied by CEK and NWH Details Production and Production Capacity .....................................................................31

        3.    The Administrative Record Supports a Finding that NWH Produced the Steel Wire Hangers it Exported to the United States During the Period of Investigation .................................................................32

            a.    Import and Export Statistic for raw materials tie to final products .........................................................................34

i.      Verification of Total Exports ..............................................35

ii.     Verifying Total Imports .....................................................35

iii.    Comparison of Imports and Exports .................................36

iv.     The Relative Weight and Volume of Raw Materials
        and Finished Hangers .......................................................37

b.      NWH's lawful operation in a free trade zone in Thailand
        does not support transshipment........................................39

4.      The Alleged Discrepancies are not Relevant ...............................40

5.      CBP is Barred from Imputing "Adverse Inferences" as "Necessary
        Information" is Available on the Record and There are No Gaps to
        be Filled ..........................................................................43

6.      The U.S. Court of International Trade has now constrained CBP in
        EAPA investigations from issuing determinations based on
        confidential information not made available to the parties against
        whom it is used ................................................................45

V.      Conclusion ................................................................................46

# Table of Authorities

***Court Cases:***

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ...............9, 27

 *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984)........7

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938) ..........................8

*Diversified Products Corp. v. United States*, 6 CIT 155 (1983) ...............................8

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997).................9, 27

*Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301 (Fed. Cir. 2009)...............9, 28

*Novosteel SA v. United States,* 284 F. 3d 1261 (Fed. Cir. 2002).......................9, 28

*Royal Brush Manufacturing, Inc. v. United States*, Ct. No. 19-00198, Slip Op.
    20-171 (Ct. Int'l Trade  Dec. 1, 2020) ...............................................................45

*Star Fruits S.N.C. v. United States,* 393 F.3d 1277 (Fed. Cir. 2005) ........................7

*Tung Mung Dev. Co., v. United States*, 354 F.3d 1371 (Fed. Cir. 2004) .................9

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .........................................8

*USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487 (1987)...............8, 27

*Wheatland Tube Co. v. U.S.,* 495 F.3d 1355 (Fed. Cir. 2007) ...................................8


***Statutes and Regulations:***

19 U.S.C. 1508....................................................................................................30

19 U.S.C. §1517....................................................................................................7

19 U.S.C. § 1517(b)(1)........................................................................................45

19 U.S.C. § 1517(c)(2)........................................................................................45

19 U.S.C. § 1517(g) ........................................................................................2, 7

19 C.F.R. § 165.0 ...............................................................................................10

19 C.F.R. § 165.4(e)...........................................................................................46

19 C.F.R. § 165.11(b) .........................................................................................10

19 C.F.R. §165.11(b)(6)......................................................................................10

19 C.F.R. § 165.15(b) ...................................................................................10, 11

19 CFR §351.308 ...............................................................................................44

***Administrative:***

*Certain Hangers from the People's Republic of China* 73 Fed. Reg. 58,111
(October 6, 2008) ................................................................................................4

## I.   INTRODUCTION

This is an appeal brought pursuant to the section 517(g) of the Tariff Act of 1930, as amended by the Trade Facilitation and Trade Enforcement Act of 2015 ("EAPA") to contest the September 16, 2021 decision of U.S. Customs and Border Protection ("CBP") and CPB's January 28, 2022 Administrative Review determination. Plaintiff CEK Group was named in the EAPA action and actively participated in the EAPA investigation and review.

Plaintiff asserts the following errors in U.S. Customs and Border Protection's determinations:

- The EAPA investigation should not have been initiated.   CBP was presented with insufficient information to support an initiation of an EAPA action;

- CBP improperly rejected certain evidence proffered by the parties to the investigation and then cited the absence of certain evidence as one of the bases for the determination;

- Even if the allegation was adequate, the record is devoid of substantial evidence of evasion and thus the determination is unsupported by law; and

- CBP improperly took adverse inferences in the absence of gaps in the record.

## II.   STATEMENT PURSUANT TO RULE 56.2(c)

### A.   The Administrative Determination Under Review

This action is brought pursuant to 19 U.S.C. § 1517(g)  to contest U.S. Customs and Border Protection's September 16, 2021 decision and its January 28, 2022 Administrative Review.

In the determination CBP found the CEK had evaded the antidumping duty order on Hangers from China by means of transhipment of such hangers through Thailand.

### B.   Issues of Law

The Plaintiff presents the following issues of law.  In each instance, CPB's decision was not based on substantial evidence on the record, and was arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with law.  The issues are:

1. **Issue.**  Whether the allegations submitted by alleger contained sufficient information to support an initiation of the investigation;

2. **Issue.**  Whether CBP may, in the absence of regulations or written filing procedures, prevent parties to the investigation from submitting information for the record and whether  CBP can take adverse inferences due to the absence of such information;

3. **Issue.** Whether CBP may make a finding of evasion in the absence of substantial evidence of evasion;

**4. Issue.** Whether CBP may take adverse inferences in the absence of any gaps in the record; and

5. **Issue.** Whether CBP improperly withheld certain information from the parties during the investigation.

### C.  Summary of Arguments

- The allegation filed with CPB was inadequate on its face.  It provided no evidence, let alone substantial evidence of evasion of the order.    In the absence of any evidence, the regulatory requirement that the allegation should reasonably suggest evasion and CBP should not have instituted this investigation.

- During the course of the investigation, various parties sought to provide evidence to CBP of actual production of hangers by NWH.  CBP created artificial barriers to the filing of such information, including filing limitations not contained in either the regulations or published guidance for the filing of documents.   CBP rejected numerous high quality videos, citing file size requirements and the refusal to accept the videos on multiple mediums.  CBP should not have rejected the numerous high definition videos offered by CEK, and once it does so, CBP is precluded from taking adverse inferences because of the resolution quality and lack of number of videos.

- Even if the allegation were found to be valid, and the investigation was properly initiated, there is no substantial evidence of evasion on the record, and, in fact, there is substantial evidence of actual production.    The information submitted by CEK and NWH established that the raw materials importer were raw materials, that the hangers produced and exported reflected the raw materials imported, and all evidence showed ongoing production.

- To the extent that CPB is taking adverse inferences, such action is improper. The information necessary for the determination is of record, and to the extent that any information is missing from the record, such information is

unnecessary.  In the absence of gaps in the record, CBP had no basis to take adverse inferences.

### D. Statement of Facts

On October 6, 2008  the United States published an Antidumping Duty Order imposing antidumping duties on *Certain Hangers from the People's Republic of China*.  See 73 Fed. Reg. 58,111 (October 6, 2008).  This appeal concerns the final determination of evasion made by U.S. Customs and Border Protection's Office of Trade Regulations and Rulings on September 16, 2021 and the results of the January 28, 2022 Administrative Review of the determination.

On July 6, 2020, M&B Metal Products Company, Inc. ("M&B" or "Alleger") filed four separate allegations that certain entities were evading the Antidumping duty order on steel wire garment hangers from the People's Republic of China by means of transshipping such hangers through Thailand.  One of the four allegations was filed against CEK Group LLC. CEK submits that the allegation filed against it was insufficient to support the initiation of an EAPA investigation.  This challenge only goes to the allegation filed against CEK Group.   (BPID 5, PD 5[1]).

In this allegation, M&B included a confidential "market report" and did not provide an adequate summary of this report.  (BPID 5 at 48-74, PD 5 at 48-49) This

---

[1] BPID is a reference to the Business Proprietary Document number, PD is a reference to the Public Document number.

report purportedly laid out the factual basis for the allegation and was the primary support for the allegation.   Neither this confidential "market report" nor an adequate summary of such report was released to the parties until the filing of this Court case, and at that time it was only released to counsel under an APO.

The "market report" [

]

]

CBP acknowledged the receipt of allegations made against CEK on August 26, 2020 (PD 10). On September 14, 2020, CBP initiated Consolidated Case No. 7501 with regard to multiple importers including CEK. (PD 29).  CBP did not notify CEK of the filing of the allegations nor did it notify CEK of the initiation of this matter.

On January 28, 2021 CBP sent a request for information to CEK (BPID 1, PD 1) and on February 25, 2021, CEK submitted a response to this request for information (BPID  31 , PD 49).

On February 26, 2021, CBP issued a supplemental RFI to CEK (BPID 32, PD 5 at 51) and on April 2, 2021, alleger submitted factual information. (PD 55.)

On April 9, 2021, CEK submitted rebuttal factual information (PD 51), which submission was rejected by CBP on April 15, 2021 (PD 60) and on April 19, 2021 CEK resubmitted its factual information. (PD 57 and 60.)

On April 22, 2021, CBP rejected CEK's April 19, 2021 submission of factual information. On April 27, 2021 CEK filed rebuttal voluntary factual information (BPID 34).  During the submission process, CBP did not allow CEK to submit all of the video evidence that it wished to submit, including multiple videos of the production facility producing hangers, refused to accept service of certain video evidence, and limited the size of video files submitted impacting their resolution. (PD 63)

On May 10, 2021 CEK submitted written argument (PD 64) and on May 25, 2021 CEK submitted rebuttal to alleger's comments (PD 66).  On September 16, 2021, CBP issued its determination.  In this September 16, 2021 determination, CBP did not respond to all of the arguments presented by CEK. (PD 70)

Prior to the filing of the request for an administrative review, CEK requested an expansion of the number of pages in order for CEK to address arguments presented by CEK but not addressed by CBP in its initial determination. (PD 103) Such request was denied. (PD 105) On October 29, 2021 CEK filed a request for an Administrative Review of the Department's determination. (PD 106)

On January 28, 2022, CBP issued its decision in response to CEK's request for an Administrative Review.  In this decision, CBP continued to wrongly find that CEK's supplier had evaded the order on wire garment hangers by means of trans-

shipment. CBP continued to refuse to address certain arguments made by CEK and held that due to time constraints, refused to provide CEK additional pages. (PD 114)

## III.    STANDARD OF REVIEW

The Court will hold unlawful CBP determinations in EAPA matters if CBP failed to comply with all relevant procedures or if the determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 19 U.S.C. §1517(g).  To determine whether CBP's interpretation and application of 19 U.S.C. §1517 is "in accordance with law," the courts review the statute to determine whether "Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984).

CBP abuses its discretion when it bases its decision "on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence or represent an unreasonable judgment in weighing relevant factors". *Star Fruits S.N.C. v. United States,* 393 F.3d 1277, 1281 (Fed. Cir. 2005).  In this matter, the determination is based on factual findings that are not supported by substantial evidence.

If the statute is silent or ambiguous with respect to the specific issue, the Federal Circuit has held that *Chevron* deference is owed CPB's statutory interpretation. To determine reasonableness, courts look to the express terms of the

statute, the objectives of the statute, and the objectives of the statutory scheme as a whole. *Wheatland Tube Co. v. U.S.,* 495 F.3d 1355, 1361 (Fed. Cir. 2007).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), *quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938). Furthermore, "substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (quotations omitted). Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to {that} view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161 (1983) *quoting Universal Camera*, 340 U.S. at 488.

Moreover, CBP's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987). The substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory

evidence or evidence from which conflicting inferences could be drawn.'"  *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citation omitted).

CBP must make its decisions based on a fair and balanced comparison of the data.  To do otherwise is arbitrary and capricious. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d at 1562 ("substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence.").

Moreover, when substantial evidence is not utilized, such action is tantamount to the use of speculation in making a determination. *See Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute 'substantial evidence.'" (quoting *Novosteel SA v. United States,* 284 F. 3d 1261, 1276 (Fed. Cir. 2002) (internal quotation marks omitted)).  In this matter, CBP does not have substantial evidence of evasion and the decision is based on unsupported speculation.

It is axiomatic that CBP may not exert its authority in an arbitrary or capricious manner.  *See, e.g., Tung Mung Dev. Co., v. United States*, 354 F.3d 1371, 1378 (Fed. Cir. 2004).   CBP's decision will be set aside if it is arbitrary and capricious.

In sum, as detailed below, CBP's evasion determination, as affirmed by CBP's administrative review, falls short of the Court's standard of review and cannot stand.

## IV.   ARGUMENT:

### A.   The Allegation Does Not Support Initiation of the Investigation

#### 1.   The Regulatory Criteria are not Satisfied

CBP does not self-initiate EAPA actions.   The regulations provide specific procedures which must be followed for the initiation of an EAPA investigation.  (19 C.F.R. § 165.0).    In order to CBP to initiate an EAPA action, there must be an allegation containing specific information.   19 C.F.R. § 165.11(b) lists the elements of the allegation.  In this matter, the allegation fails to meet 19 C.F.R. §165.11(b)(6). This regulation provides:

> Information reasonably available to the interested party to support its allegation that the importer with respect to whom the allegation is filed is engaged in evasion.

The regulations also provide explicit direction as to how the allegations are to be reviewed for compliance.    19 C.F.R. § 165.15(b) provides the criteria for initiation.

> **(b) Criteria for initiation.** CBP will initiate an investigation under subpart C of this part if the following criteria are satisfied:
>
> (1) **Nature of merchandise.** The covered merchandise described in the allegation or Federal agency request for an investigation is properly within the scope of an AD/CVD order. If CBP lacks sufficient information to

make such determination as to the scope of the order, then it will refer the matter to the Department of Commerce pursuant to § 165.16.

(2) ***Likelihood of evasion.*** **The information provided** in the allegation or Federal agency request for an investigation **reasonably suggests** that the covered merchandise has been entered for consumption into the customs territory of the United States through evasion as it is defined in § 165.1.

19 C.F.R. § 165.15(b)(Emphasis Added)

As set forth herein, the allegation does not contain sufficient information to "reasonably suggest" that the covered merchandise has been entered for consumption into the customs territory of the United States through evasion".

The first portion of the allegation is "background information" (BPID 5 at 2-4, PD 5 at 2-4). This portion of the allegation implies that "general trends" and the "existence of other instances of circumvention" support a finding of trans-shipping. Essentially, M&B alleges, that the mere presence of imports from Thailand is proof of trans-shipment. M&B ignores the fact that most of the imports from Thailand are not the subject of any allegation – in other words the majority of the imports are unquestionably no evading. M&B's allegations have no basis in fact or logic. While it is true that there are "high dumping rates" on Chinese hangers, this is simply a factor which goes into making a business decision as to the source of supply. There is no basis to assume that the "high" dumping margins on Chinese actions would only be addressed by the taking of an improper actions – and such actions would ultimately be subject to additional duties and other penalties as a result. It is least as rational to assume that these high duties create an incentive for the creation of a new

Non-Confidential

factory in another country and produce the merchandise not subject to an AD or CVD order.  This is what NWH did when it built a production facility in Thailand and is also what alleger did, when it created a substantial operation in Mexico.  That other entities in other countries may have engaged in trans-shipping also is not relevant to the operations in Thailand   Under this theory, the alleger's theory, its own imports from Mexico would also be suspect in that they are hangers, that China is subject to high dumping rates, and trans-shipping may be occurring in other countries.   This is, of course, a logical fallacy.

Alleger argues (BPID 5 at 4, PD 5 at 4) that the [

] Such allegation, however, is not based in either fact or reality.  The purported [

.]   Furthermore, at least with respect to CEK, the allegation is false.  CEK supplied, Exhibit CEKR-6 to its submission of factual information, (BPID 34 at 52-56) which contained excerpts from CEK's ACE report.  This information is generated directly from the Automated Commercial Environment which is CBP's electronic system fo the filing and processing of Customs Entries and related documents. This report established that CEK fully and correctly [

].   Critically, such data is also wholly irrelevant to the question of evasion.

As an initial matter, most of the imports from Thailand are from an entity named [

Non-Confidential

As such, the volume of imports from Thailand cannot form a basis for a finding of evasion.    The majority of the hangers imported from Thailand, as they were not the subject of an EAPA allegation, were necessarily not evading, and thus the "increased volume" of hangers from Thailand is also not attributable to evasion.

 2.  *No Evidence that Garment Hangers from NWH were Likely Made in China*

In the allegation alleger claims to provide "compelling" evidence that NWH's Hangers were likely made in China.  This is simply not true and such information is not only not compelling, it is not evidence.  (BPID 5 at 5-8, PD 5 at 5-8). Initially, Alleger makes a reference to a confidential bill of lading.  [

Non-Confidential

]

The second, and most significant, portion of the allegation is based on a foreign market research report. (BPID 5 at 48-74, PD 5 at 48-49). This specific part of the allegation is the primary "support" for the allegation and is discussed in detail in section IV.A.5 of this memorandum.

The third piece relates to the inability of the foreign market researcher to obtain financial information about NWH. (BPID 5 at 6 -7, PD 5 at 6-7). It uncertain how this would have any probative value. M&B, as well as its foreign market researcher, obtained information on NWH through the Thai Ministry of Commerce website, the Department of Business Development (DBD). According to the allegation, "Although NWH was established in June 2018, the company has not submitted any financial data to the Thai Government." (BPID 5 at 6, PD 5 at 6). This, again, is not evidence in support of an allegation, but rather this statement is made without providing any context and falsely creates the impression that this is due to some impropriety on NWH's part.

The allegation makes the absolute statement that no submissions were made to the Thai government. The allegations cite the DBD website as proof of the

inaccurate reporting, but they show nothing to indicate that the DBD website is the standard platform for all Thai companies to submit their financials to the government. Without that, they do not show that no submissions were made, only that no submissions were viewable in the DBD system.

Crucially, this allegation also does not establish whether companies submitting their financials retain the option to keep them from being posted publicly. Without that information, the lack of data on the DBD site has no inherent meaning – companies would have a variety of obvious reasons for keeping their financial information private, like hiding proprietary information from customers or competitors. This is not uncommon.  Many privately held U.S. companies keep their financial information private and some states do not even require the disclosure of owners.

Furthermore, the allegation does not present any evidence that Thai companies are required to display their financial data on the DBD website. The allegation does not cite any Thai regulations that would require financial statements to be posted online. The allegation does not provide additional examples of other Thai companies to demonstrate this requirement. Presumably, the alleger wishes to avoid the question entirely, since a brief survey of Thai companies in the DBD database shows that withholding public financial statements is a common occurrence.

Further, there is no indication that NWH has not filed the appropriate information with the Government of Thailand, but rather simply that information desired by alleger has not been released or is of the type not released for companies such as NWH.   In fact, it is clear from the information provided by alleger that, in fact, NWH's response to the Government of Thailand has been adequate.  As noted clearly stated in the supporting document to the allegation, NWH's status is shown as operating.  (BPID 5 at 23, PD 5 at 23.)  If NWH had not provided the necessary information, the document produced by the DBD would not show the NWH as operating, but rather would indicate that NWH's filing was deficient or some similar language.

Alleger also suggests that the wrong SIC code has been selected.  (BPID 5 at 7, PD 5 at 7). Such code is self-selected and this code is not verified by the Thai Government.   This SIC code, which serves no meaningful purpose, appears to have been mis-selected.   This is not evidence of transshipment.

The fourth allegation is an attempt to smear NWH with actions by unrelated parties in other EAPA cases.  This tie is based on the fact that the same importer from another EAPA case is also the same importer responsible for the first imports from NWH.   This is, again, no evidence of circumvention by CEK.  Importers seek product to fill demand from a range of sources.   That an importer would change from one supplier to another is not an indication of transshipment of a supplier, it is

merely an indication of the need for supply for the importer's business.  It also presumes that an importer would not learn from prior experiences and seek to find a way to legally import needed product.   Further, none of the allegations related to CEK.  As part of this, the alleger also references a "website" in which a Chinese Supplier,  Shaoxing Maosheng,  advertises its hangers and states that they are exported to the United States.

Alleger references the website "Made-In-China" and Shaoxing Maosheng's profile drawing attention to the statement that "its products are exported to the United States." (BPID 5 at 7, PD 5 at 7.) This citation is presented without context to create the implication that Shaoxing Maosheng's profile is "evidence" that its product is entering the US via transshipment.    Alleger ignores significant information in this profile page and its claims are nothing more than unsupported speculation.

CEK submits that this profile is not evidence of anything. The profile unequivocally states that this account was created in 2015, several years before the alleged transshipment occurred and several years before NWH was established. The line below the registration date records the last date when the manufacturer logged in to their profile: January 14, 2015, or more than 6 years ago. This means that any reference to shipments to the US must logically reference events that preceded NWH's formation and exports by nearly 4 years.  Further, the fact that a Chinese

producer may have exported product to the United States at some point, and then stopped, is not evidence of transshipment.

This profile statement also does not indicate whether Shaoxing Maosheng was selling "products" that made their way to the United States via legitimate channels of trade and doesn't even clearly indicate that "products", they means "hangers."

Furthermore, only a single product was ever added to this profile and that addition to the profile was not even completed, since no photo was ever added. Alleger nevertheless included in their exhibit the "The Selected Suppliers You Might Like" section below the profile that shows pictures of hangers provided by other unrelated suppliers – possibly to create the impression of greater activity (and therefore relevance to this allegation) on a profile that appears never to have been completed and ultimately abandoned. (BPID 5 at 90-91 , PD 5 at 67-68.)

A further attenuated tie is alleged based on the fact that a "Mr Tu" is shown on the website and a "Mr. Zhongming Tu" is shown as a director of NWH and thus they could be the same person.  (BPID 5 at 8, PD 5 at 8) No evidence other than the "name" and a general geographic location is presented.  China has 1.4 billion people. The family name "Tu" is the 179th most common family name in China.   That two people should happen to have the same common family name, even in the same general geographic region, is neither rare, nor unusual or probative.  Consider, for example, that Kimberly Young is a lawyer with counsel for the alleger.  To name

just a few other instances, Kimberly Young is also the director of marketing for Allstate insurance.  Kimberly Young is also the Coordinator of special programs at the William M. Scholl College of Pediatrics.  Kimberly Young was an expert on internet addiction.  Kimberly Young is an associate with Moore, Ingram, Johnson & Steele, LLP. Kimberly Young is a lawyer with Elk & Elk Co., Ltd.  Kimberly Young is a partner with Gordon Rees Scully Mansukhani LLP.   And so on.  It is inherently unreasonable to find that the mere fact that two individuals share the same common last name means that they are the same person.

### 3.   The Number of Importers of Garment Hangers from Thailand is Irrelevant

Alleger discusses the nature of all of the importers and implies that because the hangers were imported by a small group of importers, they were somehow transshipped.   (BPID 5 at 8-13, PD 5 at 8-13). There is no causal tie between importers, who look for legitimate sources to supply their customers and trans-shippers.   That importers may have purchased from a number of sources is nothing more than the normal behavior of rational businesses seeking to supply products to their customers.

### 4.   Allegers Claim of Substantial Unpaid Duties is Based on Faulty Assumptions

Alleger argues that there is evidence of transshipping because there are substantial unpaid duties. (BPID 5 at 13, PD 5 at 13.)  M&B is engaging in a logical

fallacy.   There would only be "substantial unpaid duties" if, in fact, transshipping were occurring.  If, as CEK contends, these hangers are being produced in Thailand by NWH, there is no transshipping, and thus no unpaid antidumping duties, let alone substantial unpaid duties.  As such, the amount of any speculative unpaid duties is not probative to the question of transshipping.

> 5.   *The Market Research Report Contains No Evidence of Evasion and Contains Evidence of Production*

The single most important part of the allegation is the "market research" report which has been proffered as primary support and the basis for many of the "facts" showing evasion.  In fact, the market research report is not only devoid of any evidence of evasion, it provides support of actual, ongoing production operations. (BPID 5 at 49-50, PD 5 at 48-49) We will examine each point of this report seriatim. As the report was claimed to be entirely confidential, and neither the report nor a summary were provided to CEK in the administrative proceeding, this is the first opportunity for CEK to go through this report in detail.

[

]

Non-Confidential

[

]

Non-Confidential

[

]

Non-Confidential

[

]

---

2 The Court can take judicial notice of the fact that Gary Locke, the former U.S. Secretary of Commerce, while of Chinese ethnicity, is unquestionable an American.

Non-Confidential

[

]

Non-Confidential

[

]

Non-Confidential

[




























]

Furthermore, CBP must make its decisions based on a fair and balanced comparison of the data.  To do otherwise is arbitrary and capricious. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d at 1562 ("substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence.").

Moreover, when substantial evidence is not utilized, such action is tantamount to the use of speculation in making a determination. *See Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute 'substantial evidence.'" (quoting *Novosteel SA v. United States,* 284 F. 3d 1261, 1276 (Fed. Cir. 2002) (internal quotation marks omitted)).

In this case, particularly in the case of the market researcher report, there is no substantial evidence supporting a finding of evasion.  At best there is speculation based on

]

## B.    CBP Improperly Rejected Video Evidence Presented by NWH

NWH sought to submit multiple high resolution videos showing the substantial processing operations on the raw materials.  These videos were all time stamped showing the date and time of the videos.  NWH submitted these videos on disk and provided them to CBP.  (BPID 5 at 48-74, PD 5 at 48-49)    CBP rejected these videos and sought to discourage NWH from submitting such data – stating that "the videos are actually not necessary for your submission, we tend to rely more on paper documents". (BPID 5 at 48-74, PD 5 at 48-49)    CBP ultimately provided a limited opportunity to submit the videos on a limited basis and a limited resolution.

CBP then, in the determination stated:

> The March 23-25 surveillance videos submitted by NWH are grainy and appear to have a low resolution. Most videos are taken from a fixed point in the factory, and show certain hanger making machines. The video titled "NWH NFI factory area out to in" takes the viewer from outside the industrial zone to inside the factory, and shows where the surveillance camera is located, about the halfway point of the factory where one half appears to be hanger making machines and the other half used for inventory, strut attaching and cape attaching. The surveillance videos show machines closer to the camera are more clear, while machines further away, and even on the opposite side of the factory are not clear, and present a grainy image.
> * * *
> We have not summarized all videos because they are generally similar, but the quality of the videos does not allow us to ascertain hanger production throughout the factory.

(PD 70 at 31-32 )

The Department's rejection of the data (and the absence of any regulations regarding the procedures and limitations on the submission of data), and then taking adverse inferences because the rejected data was not provided is an abuse of discretion.   CPB should have permitted the submission of all of the data sought to be submitted and cannot draw adverse inferences because data was "missing" on "unclear" or "grainy" because CBP would not allow submission of this information.

### C.   Even if the Allegation were Adequate, there is no Substantial Evidence of Evasion

Even if the allegation were adequate, which we submit was not, the totality of the record demonstrates the absence evidence of evasion.

#### 1.   Certain Information Not Supplied Irrelevant to CBP's Analysis

As an initial matter, not all the requested information was provided by the

interested parties named in this case. Regarding the request for information issued to CEK Group, while TRLED contends it is unable to rely on the information contained in CEK Group's CF28 response dated, February 24, 2021, to determine where the imported hangers were manufactured, CEK Group asserts the information not supplied in its response is ultimately irrelevant to CBP's AD/CVD evasion and transshipment analysis. CEK Group reiterates that it responded in its entirety to questions relevant to this investigation and provided the information for which it had knowledge. CEK Group did not find it necessary to address the remaining questions and requests made by CBP as the requested information is not necessary for finding of the absence of transshipment.   Interestingly enough, numerous irrelevant questions posed in the CF28 seem to be drafted to validate or investigate the alleger's false claim of "a calculated conspiracy to defraud the U.S. Treasury of lawful dumping duties owed on hangers produced in China."  (BPID 5 at 4, PD 5 at 4.) CEK Group contends that such conspiracy allegations are a gross mischaracterization of the arm's length relationship between CEK Group and its supplier, NWH. To the extent of those unresponsive questions and requests for records, CEK Group asserts such questions and requests extend significantly beyond the scope of 19 U.S.C. 1508 as the questions do not relate to the business activity of importing or a finding of trans-shipment for the purposes of EAPA.

### 2. Information Supplied by CEK and NWH Details Production and Production Capacity

The record is clear and contains evidence of significant production within the period of investigation. NWH provided a complete and full response to the TRLED's questions regarding the manufacturing and origin of the products, as well as video evidence establishing real-time manufacturing of these imported goods.

CEK tendered video tying the factory gate to the facility and to the operating machinery. NWH provided many hours of time-stamped video showing the production of hangers from raw materials in the factory. (BPID 37-39.) The most telling evidence are the multiple security videos establishing significant on-going production. In addition, NWH provided images and videos of machinery used to produce steel wire hangers, explained the production process, machine production capacity, a detailed description of the types of machinery and equipment used in each stage of the process, daily production logs, raw material usage, raw material vendors, raw material import data, sales process, sale records, customer details, product list, the names of the owners and corporate officers and employees, including time records and wages, to CBP. (BPID 33) CEK notes that due to artificial filing restrictions, CBP refused to accept a significant quantity of information, including many videos of production and limited the resolution, by limiting file size, of those videos provided. Notwithstanding these limitations, the information provided is telling.

As detailed in Exhibit 11 to NWH's RFI response. NWH's Actual machine production capacity is as follows:

| [ | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | ] |

Notably, the actual production is far from reaching the machinery's full capacity. (BPID 33 at 13, 1135)

3.   *The Administrative Record Supports a Finding that NWH Produced the Steel Wire Hangers it Exported to the United States During the Period of Investigation.*

There is no disagreement that NWH had the ability to produce steel wire hangers during the period of investigation (August 26, 2019, through the pendency of this investigation). The administrative record supports a finding that NWH produced all of the steel wire hangers that it exported to the United States during the period of investigation.

NWH manufactures the steel wire hangers it sells to U.S. Importers and does not source from any company or supplier. The company's production process is

included in NWH RFI response.  (BPID 33 at 22) and in general includes:

1.  The order is received.

2.  The un-finished hanger is created from raw wire fed into the automatic hanger making machine.

3.  The dip paint coating is applied to the un-finished hanger.

4.  The coated hanger is placed into the oven machine to dry the plastic coating.

5.  The hangers are removed, and glue is applied.

6.  The hangers are returned to the over to dry the glue.

7.  The hangers receive a quality control inspection.

8.  The hangers are packed for shipping.

These are operations that unquestionably constitute substantial transformation and as a result the goods take on Thailand as the country of origin.

During CBP's inspection, conducted prior to the initiation of this EAPA investigation and before the period of investigation, officers examined and inspected the facility and capacity. On the day of HSI's site visit, NWH was producing hangers, had some raw materials on hand, and appeared to have a large number of hangers currently in inventory. HSI's own account of the facility confirms substantial production operations of wire hangers. (BPID 33 at 4 - 47)  Furthermore, NWH, in its response, provided the dates that machines were imported and placed into operation, records of the workers who operate the machines, and production

records showing that the operations. (BPID 33 at 968 – 1110, 1136 – 1621 )CBP knows that NWH had substantial production operations and saw both the equipment needed and ongoing operations during its visit to NWH.  Such operations were more than mere finishing, painting and packing.

With respect raw materials, NWH has provided in its response detailed records of its purchases. These include documents such as invoices, packing lists, bills of lading, and certificates of origin.  (BPID 33 at 213 to 832.)

**a.**    *Import and Export Statistic for raw materials tie to final products*

This is further confirmed by import and export statistics which show there was sufficient raw materials to produce the exported volume. Based on the information provided in NWH's RFI response, the vast majority (99.86% by M&B's calculation) of the exported goods were wholly produced by NWH's facility in Thailand. (BPID 33 at 213 to 832.) As discussed, the record shows M&B's allegation of transshipment is based on a series of unsupported, and frankly unsupportable, assumptions and contradictory to an analysis of the exhibits provided which demonstrates conclusively that (1) the raw material records provided by NWH are complete and that this in turn demonstrates that (2) the imported hangers were indeed produced in Thailand as NWH has maintained.

### *i.*     ***Verification of Total Exports***

Using the export records provided by NWH, it is possible to calculate the total gross weight of exported goods. Both the [                                        ] contain a [                                        ]. By totaling up the gross weight figures from [                                        ] for verification, a verified total weight for all shipments throughout the period under investigation is produced.

Using this method, during the August 2019 through December 2020 period, exported shipments from NWH bound for the United States totaled a gross weight of roughly [                ].   (BPID 33 at 1623 to 1626.)

### *ii.*     ***Verifying Total Imports***

During the period of investigation, NWH's [                ] as shown in NWH's response (BPID 33 at 213 to 832) show the imports of numerous items used in the manufacture of wire hangers including, but not limited to:

- Steel wire

- Galvanized wire

- Latex coating powder

- Paper tubes for struts

- Paper wrapping for capes

Within the exhibit, the individual raw material orders contain [

] In addition, the Thai customs entry form also contains a [

]. These weight values on the bills of lading and customs entry forms can be used to cross-check and verify the gross weight provided on the raw material invoices. In all cases, these figures matched one another and confirmed the accuracy of the weight entries.

Using this method, the weight of material imported during the period from [                                                        ]. As with the export totals, this total can be further verified using the records for the Free Trade Zone where the factory is situated.

### iii.    *Comparison of Imports and Exports*

When the total gross weight imported (approximately 2,656,000 gross kg) and the total weight exported (approximately 2,643,000 kg) are compared, the values roughly match with a slight difference to account for (a) wasted material, (b) differences in packaging, and (c) orders placed but not yet shipped.

Since the weights match with each other, the documents provided by NWH in Exhibits 8.3 and 14 contain no omissions and establish production at NWH's Thai facility occurred during the period of investigation to meet its sales volume - establishing no transshipment has occurred. (BPID 33 at 213 to 832 and 1623 -

1626.) Since the records have been shown to be complete, the contents of those documents – and the fact that the only potentially covered items within all of them are the 389 cartons of semi-finished hangers noted by M&B – demonstrate that there have been no other entries of covered merchandise during the period of investigation.

iv.     *The Relative Weight and Volume of Raw Materials and Finished Hangers*

In addition to verifying the weight totals, the volume in cubic meters of the imported and exported shipments was recorded. In total, imported shipments over the period of investigation totaled roughly [                    ]. Exports to the U.S. totaled roughly [        .] This means that the exported material of the same weight – since, as established above, the weight remained constant – doubled in volume (halved in density) after being processed. If the materials being brought in were finished hangers as alleged by M&B, then the imported and exported order density should be roughly the same since the items would not have changed form. The items would have, at most, simply changed packaging. On the other hand, if the items being imported were actually raw materials, then logically the tightly wound wire spools and flat-packed cape paper would occupy significantly less space than wire which had been bent into shape and packed into cardboard boxes. Since there was in fact a significant increase in the average space occupied by a given weight of

material, the only reasonable conclusion is that raw materials were being imported and then substantially transformed into significantly larger finished products.

These figures calculated based on the  [

]. (BPID 33 at 213 to 832.) The cubic meterage is verified by the associated [                ] with each order, which identify the container used for shipping and, relevant for this purpose, whether that was a 20ft. or 40ft container.

Examples at the individual invoice level provide a clear illustration of the process. Consider invoice number [          ] as an example. This invoice was for an order consisting solely of [          ], with [

]. (BPID 33 at 248 - 249.) Compare this to any of the exported [                ] included in Exhibit 14 of NWH's RFI response .  (BPID 33 at 1623 – 1626.)  It is not possible to load a weight even close to that amount without using a [              ]. This order of wire had a density (kilograms per cubic meter) of 1,387.5 kg/m$^3$, which falls within the average range of other wire orders that we calculated (all of which were above 1 metric ton per cubic meter). By comparison, the average density of the outgoing shipments to customers is about 332kg/m$^3$, less than one quarter of that amount.

In sum, the record establishes NWH had the ability to manufacture the steel wire hangers in the quantities it exported and the evidence within the record

demonstrates that NWH actually did manufacture the steel wire hangers in those quantities.

### b.  *NWH's lawful operation in a free trade zone in Thailand does not support transshipment*

FTZ's are an economic benefit subject to strong regulatory enforcement by CBP and Thai Customs and CBP should recognize the heightened regulatory enforcement. A Free Trade Zone is a long standing and legitimate mechanism recognized by CBP and foreign customs services for companies similar to NWH to avail themselves of free trade benefits. NWH admits [


].  (BPID 33 at 213 - 832). Numerous companies in similar positions, just like NWH, rely on this lawful global economic benefit.

When dealing with fraudulent trade practices such as commercial fraud and deceptive business practices, CBP collaborates closely with the U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), Commercial Fraud Programs Unit. In fact, NWH's voluntary operations in a Free Trade Zone with significantly enhanced regulatory oversight is evidence of a lack of transshipping scheme.   The use of a Free Trade Zone, in fact, decreases, not increases, the probability of transshipping.

### 4.    The Alleged Discrepancies are not Relevant

In both the allegation and in the *Notice of Investigation and Interim Measures, EAPA Cons. Case 7501,* the assessment of NWH's capacity to produce the volume of steel wire hangers it claims were exported during the period of investigation is evidence that Chinese steel wire hangers were being transshipped through Thailand. This conclusion is based on a July 30, 2019 site visit of NWH's factory by HSI Bangkok based on his observations during a one-day visit to the facility and interviews of ownership and employees. (BPID 61 at 3-14) TRLED contends it given the production quantities stated by NWH's owners/employees and Thai customs data, it is probable that the inventory at the time of the HSI site visit, which may have been sourced from China, was sold in the United States during the POI and neither owner's estimate is close to NWH's average monthly production as indicated in "Production Records".

As an initial matter, CEK Group asserts, that while CBP may have summarized HSI's interview of NWH's owners, managers and employees interviews and suggested that these interviews had discrepancies, the actual report indicates actual production, sufficient quantities of inventory, and numerous workers. (BPID 61 at 15-46)  Critically, the different viewpoints are nothing  more than the normal alternate views based on position memory and time.   They also

could represent different takes on the same question – for example, the number of workers on the company roster (as opposed to at the factory), the number of workers that were present on that day, a distinction between workers and employees and other distinctions that appear to be absent from the report.

For example, HIS seems to focus on the "number of employees", and the different numbers reported, but the actual owners and managers all agreed on a close general range of employees and the actual workers would have no overall view of the factory and would only be aware of their immediate area.  In the same way, such workers would not know the "capacity" of the factory.   Based on the fact, and reflected in the testimony, that workers would not always work their normal schedules, the exact number of employees at any one time is not clear.   What the visit (and the time sheets) establish is that there were substantial numbers of workers.

In a similar fashion, differences between one view of a fixed work schedule with 12 hours shifts and another where the employees acknowledge that they have lunch break and leave early if the work is done is, again, not a contradiction.   That a factory will have a 12 hour shift does not mean that the factory workers will all necessarily work the entire shift nor does the provision of a lunch break convert the 12 hour shift into some other work schedule.  Further, the method of compensation, again, does not convert a "shift" into something else.  A worker being paid by piece work, as opposed to hourly, is still working a shift.  Again, the difference is between

a theoretical view of the work schedule and the practical view of the work schedule. The key point is that the records (and the worker testimony) establish that the workers do, in fact, work and produce hangers.  (BPID 61 at 3-14)

The other discrepancies are similarly the difference between the platonic ideal and practicality or are the result of the limited range of responsibility of a line worker.  For example, multiple workers were asked when NWH began operations and gave different responses.   This is not surprising.   [              ], for example said that she started working for the company [            ] before the interview or January 2019.   When she indicated as the start date for operations 2018.  However, as she had not yet started working for NWH in 2018, it was nothing more than a factually unsupported guess.  [                ] similarly started in January 2019, and thus would not have first hand knowledge of the start date of NWH.  Mr. [    ] started working for NWH in March 2019, and similarly would have no first-hand knowledge as to the start date of operations. (BPID 61 at 10-14)  The other purported discrepancies are similar.   Based on guesses in response to questions seeking information that does not fall within their responsibilities.  Simply put, HSI should give no weight to these purported discrepancies as they are clearly based on guesses.

With regard to capacity, while multiple answers were given (for example, Mr. [    ] said [       ] hangers per day but [     ] hangers per five minutes (and thus more than [       ] hangers per hour), it is also not clear that whether they were referring to

their production on their machine, or the actual production, or the maximum production.   What everyone agreed upon was substantial production.  In sum, to the extent that there were "differences", such differences are not meaningful, and when taken as a totality, establish actual meaningful production.

**5.      CBP is Barred from Imputing "Adverse Inferences" as "Necessary Information" is Available on the Record and There are No Gaps to be Filled.**

As a preliminary matter, CEK Group has gone on record to formally object to certain investigatory procedures and express concern that such procedures effectively deny CEK the ability to fully participate in this investigation. Star Chamber proceedings are looked upon with extreme disfavor in the United States, and the very limited exceptions (which mostly relate to national security) simply do not apply. Specifically, the "analysis" in "Confidential Exhibit 4" of M&B's Factual Information .  (BPID 5 at 45) appears to be the basis for the conclusory factual misstatements in the subsequent paragraphs to the effect that the named importers are all "participants" in a "calculated conspiracy", are "guilty of duty evasion", and are "complicit in perpetuating injury" to the U.S. industry. However, as this was not disclosed in the investigation, CEK was precluded from establishing the lack of evidence supporting such extraordinary allegations.

Adverse inferences can only be made where there is an absence of information on the record. The term "adverse inferences" in the EAPA statute should be read *in*

*pari materia* with the term "adverse inferences" in the antidumping and countervailing duty law. Both involve similar subjects, the imposition of antidumping and countervailing duties on imports and the EAPA statute primarily goes to the enforcement of the antidumping and countervailing duty laws. Accordingly, under the basic rule of statutory interpretation that well-established terms in laws in effect prior to the enactment of a new law should be taken into account in administering the later law, "adverse inferences" should only apply when "*necessary information*" is not available on the record pursuant to the antidumping regulations, 19 CFR §351.308. Thus, if the information in question is not necessary, but rather is irrelevant to the question at issue, then it is inappropriate to apply "adverse inferences" to such "unavailable" information.

While it is true that neither NWH nor CEK responded to every question presented by CBP, its responses addressed all of the necessary information. However, adverse inferences are limited to instanced were there are gaps of necessary information on the record. In the present case, there are no gaps to actual capacity and production occurring at NWH's facility. Specifically, CEK Group's RFI response coupled with NWH's RFI response proves that while the factory has not been at operating at full capacity, it is clear that the vast majority (99.86% by M&B's calculation) of the exported goods were produced by NWH's facility in Thailand. This fact is necessary information for the purpose of this EAPA

investigation. Any gap identified by TRLED are required to be identified in context of how or why the "gap" was relevant or the data was insufficient and the missing data was relevant to the current investigation.

### 6. The U.S. Court of International Trade has now constrained CBP in EAPA investigations from issuing determinations based on confidential information not made available to the parties against whom it is used

In *Royal Brush Manufacturing, Inc. v. United States*, Ct. No. 19-00198, Slip Op. 20-171 (Ct. Int'l Trade  Dec. 1, 2020) at 7 the U.S. Court of International Trade found that CBP failed to afford an importer a meaningful opportunity to be heard when CBP did not provide that importer public summaries of the Attache Report documenting findings of the government's site visit to the foreign producer's facility.  Like the importer in *Royal Brush Manufacturing, Inc. v. United States*, CBP unlawfully failed to provide an adequate public summary of the HSI report.  CBP also improperly conducted a site visit before initiating that investigation.  Because CBP had not yet initiated an investigation pursuant to 19 U.S.C. § 1517(b)(1), CBP lacked authority to collect information pursuant to 19 U.S.C. § 1517(c)(2).

CBP also failed to require alleger to provide an adequate public version of the allegations, including the "market research" report, depriving CEK of the ability to argue at the administrative level that the matter was impermissibly initiated. Because CBP has not provided the redacted information in the government's report or a public summary of its findings, the Importers and NWH were unable to directly

respond to the evidence presented.  Pursuant to 19 C.F.R. § 165.4(e), CBP must provide public summaries of confidential information that it places on the record. CBP failed to comply with its own regulations governing the government's report that CBP placed on the record.  Therefore, CBP cannot lawfully rely on the government's report as evidence contradicting NWH's actual production or capacity (to the extent that such report contradicts the production or capacity, which it does not) to produce or as support for any determination applying adverse inferences because the Importers or NWH "failed to cooperate."

## V.   **CONCLUSION**

CEK respectfully requests that this Court grant its motion for Judgment on the Agency Record and remand this case to Customs and Border Protection directing that it dismiss the EAPA action.  Specifically, the Court should find:

That the allegation against CEK was legally insufficient and thus that the EAPA investigation against CEK was improperly initiated;

That CPB improperly rejected certain video evidence proffered by the parties and improperly took adverse inferences as a result of this rejection; and

That there is no substantial evidence of evasion and thus the finding of evasion is unsupported.

By making these changes, the Court will correct clear errors made by the

Department in its calculation of the final results.

Respectfully submitted,

/s/ David Craven
David Craven

Counsel to *CEK Group*

Dated: September 12, 2022