## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| CEK GROUP LLC,<br><br>          Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br>          Defendant,<br>.    and<br><br>M&B METAL PRODUCTS COMPANY, INC.<br><br>          Defendant-Intervenor. | Court No. 22-00082<br><br>PUBLIC VERSION |

### DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

Of Counsel:

Christopher Berridge
Jennifer L. Petelle
U.S. Customs and Border Protection
Office of Chief Counsel
1300 Pennsylvania Avenue, NW
Washington, DC 20229

REGINALD T. BLADES, Jr.
Assistant Director

/s/ Elisa S. Solomon
Elisa S. Solomon
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Suite 346
New York, New York 10278
212-264-0583

January 13, 2022

*Attorneys for Defendant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

   I.   Administrative Determination Under Review ................................................................ 2

   II.   Issues Presented For Review ........................................................................................ 2

STATEMENT OF FACTS .................................................................................................... 2

   I.   Enforce And Protect Act (EAPA) ................................................................................ 2

   II.   The Investigation ........................................................................................................ 4

      A.   Allegation and Initiation of the Investigation ..................................................... 4

      B.   Development of Administration Record .............................................................. 6

      C.   Determination Of Evasion And Administrative Review ...................................... 8

SUMMARY OF THE ARGUMENT ..................................................................................... 8

ARGUMENT ....................................................................................................................... 9

   I.   Standard Of Review .................................................................................................... 9

   II.   CBP Properly Initiated The Investigation In Accordance With Its Regulations ............... 10

      A.   CEK's Initiation Challenges Are Contrary To The Statutory Design Of EAPA
Investigations ....................................................................................................... 10

      B.   CBP Based Its Initiation Decision On Information In The Allegation That "Reasonably
Suggests" Evasion ................................................................................................ 13

   III.   CBP's Determination That Covered Merchandise Entered The United States Through
Evasion Is Supported By Substantial Evidence ...................................................... 23

      A.   CBP's Application of Adverse Inferences Is Warranted ................................ 24

      B.   CBP's Evasion Determination Is Supported By Substantial Record Evidence ............ 31

      C.   CEK's Procedural Challenges Lack Merit .................................................... 37

CONCLUSION ................................................................................................................... 45

## **TABLE OF AUTHORITIES**

### **Cases**

*All One God Faith, Inc. v. United States,*
   589 F.Supp.3d 1238 (Ct. Int'l Trade 2022) ............................................... 10, 29–31

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States,*
   751 F.2d 1239 (Fed. Cir. 1985) ........................................................................... 11

*Aspects Furniture Int'l, Inc. v. United States,*
   Ct. No. 20-03824, 2022 WL 17249645 (Ct. Int'l Trade Nov. 28, 2022) ..................... 37, 40, 44

*Dep't of Com. v. New York,*
   139 S. Ct. 2551 (2019) ........................................................................................ 10

*Diamond Tools Tech. LLC v. United States,*
   545 F.Supp.3d 1324 (Ct. Int'l Trade 2021) ........................................................... 11

*Hyundai Heavy Indus., Co. v. United States,*
   399 F.Supp.3d 1305 (Ct. Int'l Trade 2019), aff'd,
   819 F. App'x 937 (Fed. Cir. 2020) ....................................................................... 29

*Micron Tech., Inc. v. United States,*
   117 F.3d 1386 (Fed. Cir. 1997) ........................................................................... 43

*MidContinent Nail Corp. v. United States,*
   949 F.Supp.2d 1247 (Ct. Int'l Trade 2013) ........................................................... 29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................................. 10

*Nippon Steel Corp. v. United States,*
   337 F.3d 1373 (Fed. Cir. 2003) ........................................................................... 29

*Royal Brush Mfg., Inc. v. United States,*
   483 F.Supp.3d 1306 (Ct. Int'l Trade 2020) ..................................................... 42, 44–45

*Royal Brush Mfg., Inc. v. United States,*
   545 F.Supp.3d 1357 (Ct. Int'l Trade 2021) ........................................................... 42–43

*Shinseki v. Sanders,*
   556 U.S. 396 ..................................................................................................... 45

*Terry v. Ohio,*
   392 U.S. 1 (1968) ............................................................................................. 12, 13

## Statutes

19 U.S.C. § 1508 ........................................................................................................... 29

19 U.S.C. § 1517 ........................................................................................................ 2, 3

19 U.S.C. § 1517(b) ............................................................................................. 3, 11–14

19 U.S.C. § 1517(c)(1)(A) ........................................................................................ 4, 12

19 U.S.C. § 1517(c)(2) .................................................................................. 2, 3, 29, 31

19 U.S.C. § 1517(c)(3) ............................................................................. 27–28, 30–31

19 U.S.C. § 1517(e) .................................................................................................. 3, 12

19 U.S.C. § 1517(f) .................................................................................................... 2, 4

19 U.S.C. § 1517(g) .................................................................................................. 4, 10

19 U.S.C. § 1673a(c)(4)(E) ........................................................................................... 11

19 U.S.C. § 1677f(c)(1)(A) ........................................................................................... 42

21 U.S.C.A. § 360i ........................................................................................................ 12

## Regulations

19 C.F.R. § 165–165.47 ................................................................................................. 3

19 C.F.R. § 165.11(b) ............................................................................................. 10, 13

19 C.F.R. § 165.15(d)(1) ................................................................................................ 3

19 C.F.R. § 165.21 .......................................................................................................... 4

19 C.F.R. § 165.22 .......................................................................................................... 4

19 C.F.R. § 165.23 .......................................................................................................... 3

19 C.F.R. § 165.23(c) ...................................................................................... 13, 39, 40

19 C.F.R. § 165.24(a) ..................................................................................................... 3

19 C.F.R. § 165.24(c) ..................................................................................................... 3

19 C.F.R. § 165.26 ................................................................................................ 4

19 C.F.R. § 165.4(a) ....................................................................................... 42–43

19 C.F.R. § 165.41 ................................................................................................ 4

19 C.F.R. § 165.45 ................................................................................................ 4

19 C.F.R. § 165.5(a) ........................................................................................... 43

19 C.F.R. § 165.5(c) ........................................................................................... 39

19 C.F.R. § 165.6 .......................................................................................... 27–28

## Other Authorities

*Notice of Antidumping Duty Order: Steel Wire Garment Hangers from the People's Republic of China*,
   73 Fed. Reg. 58,111 (Dep't of Commerce Oct. 6, 2008) ................................ 5, 9, 33

*Steel Wire Garment Hangers from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*,
   76 Fed. Reg. 66,895 (Dep't of Commerce Oct. 28, 2011). ..................................... 33

*Notification of Final Determination as to Evasion*,
   EAPA Case No. 15135/7175 (Aug. 14, 2017) ................................................ 15, 31

*Notice of Final Determination as to Evasion*,
   EAPA Consol. Case No. 7191 (Mar. 15, 2018) .............................................. 14, 16

*Notice of Determination as to Evasion*,
   EAPA Cons. Case No. 7357 (Oct. 26, 2020). ...................................................... 15

*Notice of Determination as to Evasion*,
   EAPA Cons. Case No. 7379 (Sept. 23, 2020) ................................................ 14, 16

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| CEK GROUP LLC,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES,<br>　　　　　　　Defendant,<br>.　　and<br><br>M&B METAL PRODUCTS COMPANY, INC.<br><br>　　　　　　　Defendant-Intervenor. | Court No. 22-00082<br><br>CONFIDENTIAL VERSION |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response in opposition to the motion for judgment on the agency record filed by plaintiff, CEK Group LLC (CEK). *See* Mot. for J. Pursuant to Rule 56.2 Motion of the Rules of the U.S. Court of International Trade (ECF No. 33 (confidential), ECF No, 34 (public)) ("Pl.'s Br."). CEK alleges that U.S. Customs and Border Protection (CBP) should not have initiated an investigation in response to an allegation filed by M&B Metal Products Company, Inc. (M&B or "Alleger") because that allegation lacked evidence of evasion as to entries of steel wire hangers from the People's Republic of China. CEK also challenges CBP's final determination of evasion. As demonstrated below, CBP's decision to initiate an investigation and its determination that the country of origin of the subject merchandise covered by the investigation was not Thailand, as CEK had indicated on its entry paperwork, are both supported by record evidence and are in accordance with law. Accordingly, we respectfully request that the Court deny CEK's motion and sustain CBP's evasion determination.

I.    <u>**Administrative Determination Under Review**</u>

CEK challenges CBP's September 16, 2021 determination as to evasion for certain shipments of wire hangers from Thailand and CBP's January 28, 2022 administrative review of that evasion determination.  *See* Trade Remedy Law Enforcement Directorate (TRLED) – Final Determination, EAPA Cons. Case No. 7501 (September 16, 2001) (C.R. 36; P.R. 70); Office of Trade, Regulations and Rulings (ORR) Admin. Review Determination, EAPA Case No. 7501 (P.R. 114) (Jan. 28, 2022).[1]

II.   <u>**Issues Presented For Review**</u>

1.  Whether CBP's initiation of an investigation in response to an EAPA allegation that reasonably suggested evasion was in accordance with law.

2.  Whether CBP's evasion determination is supported by substantial evidence.

## <u>STATEMENT OF FACTS</u>

I.    <u>**Enforce And Protect Act (EAPA)**</u>

"Enforce and Protect Act" or "EAPA," empowers CBP to investigate allegations that an importer has evaded antidumping (AD) or countervailing duty (CVD) orders.  *See* 19 U.S.C. § 1517.  Under EAPA, federal agencies or interested parties may submit allegations to CBP concerning evasion of AD/CVD orders.  Upon receiving an allegation, the statute mandates a formal investigation process.

Congress granted CBP broad discretion to determine the scope and means for conducting an EAPA investigation.  *See* 19 U.S.C. § 1517(c)(2).  CBP promulgated implementing regulations that describe applicable procedures for filing allegations of evasion, CBP

---

[1] C.R. refers to the confidential administrative record filed with the Court (ECF Nos. 21-22), and P.R. refers to the public administrative record filed with the Court (ECF No. 16).

investigation's procedures, and CBPs' administrative review of an evasion determination.  *See* 19 C.F.R. § 165–165.47.

Generally, the investigation of an EAPA allegation proceeds as follows.  Upon receiving an allegation, 19 U.S.C. § 1517 directs that CBP "shall initiate an investigation" within 15 business days of receipt of the allegation if it "reasonably suggests that covered merchandise has been entered into the Customs territory of the United States through evasion."  19 U.S.C. § 1517(b)(1).  Within 90 calendar days of initiating an investigation, TRLED, within CBP's Office of Trade, will determine whether there is a "reasonable suspicion" that the importer is evading an AD/CVD order and to issue interim measures to protect revenue during the investigation, which can include the suspension and extension of unliquidated entries.  *See* 19 U.S.C. § 1517(e); 19 C.F.R. § 165.24(a).

The EAPA statute is silent as to a time frame for when CBP must provide interested parties with notice of initiation of an investigation or interim measures.  However, CBP's regulations provide that it will notify parties to an investigation of a decision to initiate no later than 95 calendar days after the initiation decision has been made (19 C.F.R. § 165.15(d)(1)), and no later than 5 business days after CBP imposes interim measures (19 C.F.R. § 165.24(c)).

After any "interim measures" are put in place, CBP continues its investigation.  During the investigation, CBP has the authority to "collect such additional information as is necessary to make the determination through such methods as {CBP} considers appropriate, including by . . . issuing a questionnaire with respect to such covered merchandise" to, *inter alia*, the importer alleged to have engaged in evasion and the foreign producer of the covered merchandise.  19 U.S.C. § 1517(c)(2).  Parties to the investigation may also voluntarily submit information to CBP within 200 days from the date of the initiation.  19 C.F.R. § 165.23.  Parties

also have 230 calendar days to submit written arguments and 15 calendar days to submit rebuttal information to other parties' written arguments.  *See* 19 C.F.R. § 165.26.  CBP's regulations provide that it will develop an administrative record from, among other things, "{m}aterials obtained and considered by CBP" during the investigation, voluntary factual information submitted by parties, and "{m}aterials from other agencies provided to CBP pursuant to the investigation."  *See* 19 C.F.R. § 165.21.

No later than 300 calendar days after initiating the investigation, CBP's TRLED "shall make a determination, based on substantial evidence, with respect to whether such covered merchandise was entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(c)(1)(A); *see also* 19 C.F.R. § 165.22.  Within 30 business days of TRLED's determination, interested parties may request that ORR, within CBP's Office of Trade, will conduct an administrative review of that determination.  *See* 19 C.F.R. § 165.41.  ORR will then conduct a *de novo* review based on the same administrative record considered by TRLED.  *See* 19 C.F.R. § 165.45.  ORR must complete its review and issue its determination no later than 60 business days after a request for administrative review.  19 U.S.C. § 1517(f).  EAPA permits for judicial review in this Court.  *See* 19 U.S.C. § 1517(g)(1).

## II.  The Investigation

### A.  Allegation and Initiation of the Investigation

On July 6, 2020, M&B, a domestic manufacturer of hangers filed four allegations pursuant to EAPA concerning CEK and three other importers.[2]  *See* M&B Thai Hangers Allegation CEK Group (C.R. 5, P.R. 5) ("CEK Allegations").  M&B alleged that the importers

---

[2] M&B submitted allegations concerning three additional importers: D&J Trading, Inc., Power Poly & Hanger Supply, Inc., and KSA Supply Corporation.  *See* C.R. 5–8; P.R. 5–8.

were evading an AD order on steel wire garment hangers from China by transshipping hangers manufactured in China through Thailand.  *Id.*; *see also Notice of Antidumping Duty Order: Steel Wire Garment Hangers from the People's Republic of China*, 73 Fed. Reg. 58,111 (Dep't of Commerce Oct. 6, 2008) (the "AD order").  M&B alleged that the importers sourced their hangers from a common manufacturer in Thailand, NWH Manufacturer Company Ltd. (NWH).  *See* CEK Allegations at 2.

On August 26, 2020, CBP acknowledged receipt of these allegations.  *See* Acknowledge Receipt of Properly Filed Allegation Regarding CEK Group (P.R. 10).  On September 14, 2020, after determining that the information provided in the allegation reasonably suggested the importers entered covered merchandise into the customs territory of the United States through evasion, CBP initiated a consolidated EAPA investigation.  *See* CBP's Initiation Memo., EAPA Case No. 7501 (C.R. 17; P.R. 29).[3]

On December 11, 2020, CBP issued a notice of initiation and imposition of interim measures based on a reasonable suspicion that the importers had entered covered merchandise into the United States through evasion.  *See* External Notification Email (P.R. 99).  This was the first time that CBP provided external notification of the investigation to CEK and the other importers.  CBP imposed interim measures on the importers' entries, which included suspending liquidation of the entries entered after the initiation of the investigation (September 14, 2020), extending the liquidation period for unliquidated entries, and requiring cash deposits for unliquidated entries.  *Id.*  On December 18, 2020, CBP issued a memorandum describing its initiation decision and its decision to impose interim measures.  *See* Notice of Initiation and

---

[3] CBP also issued initiating memoranda for each individual importer.  *See* C.R. 18–20; P.R. 30–32.

Interim Measures at 2 (Dec. 18, 2020) (C.R. 25; P.R. 39).  CBP described that the entries

covered by the period of investigation (POI) are those entered for consumption, or withdrawn

from warehouse for consumption, from August 26, 2019, through the pendency of the

investigation.  *Id.*  CBP also added a memorandum to the administrative record concerning a site

visit of NWH's facilities conducted by Homeland Security Investigations (HSI), a sub-

component of Immigration & Customs Enforcement (ICE), and videos taken during that visit.

*See* Memo Re: Adding Information to the Record and Synopsis of HSI Site Visit (C.R. 61, P.R.

101), and corresponding videos (C.R. 62-66).

### B. Development of Administration Record

On October 7, 2020, CBP issued a CBP Form 28 Request for Information (CF28) to CEK

and the other importers.  *See* CF28 Forms (C.R. 21–24).  CEK provided its responses on

November 3, 2020.  *See* CEK CF28 Response (C.R. 60).  CBP found that CEK's CF28 response

included "multiple discrepancies and is not complete."  *See* Notice of Initiation and Interim

Measures at 7–13 (detailing the deficiencies).

CBP subsequently sent Requests for Information (RFIs) to the importers, including CEK,

as well as the manufacturer, NWH.  *See* Request for Information to CEK (C.R. 1; P.R. 1).[4]  CEK

provided a response to the RFI on February 25, 2021.  *See* CEK's RFI Response (C.R. 31;

P.R. 49).  The three other importers did not provide any response to the RFIs.

After determining that CEK's initial response lacked several categories of requested

information, CBP issued a supplemental RFI to CEK on February 26, 2021.  *See* Supplemental

RFI to CEK (C.R. 32, P.R. 51).  CEK did not respond to the supplemental RFI.  On March 10,

---

[4] *See* RFI to D&J (C.R. 2; P.R. 2); RFI to KSA (C.R. 3); P.R. 3); RFI to Power Poly (C.R. 4; P.R. 4).

2021, CBP requested that CEK confirm that it had received the supplemental RFI or indicate

whether it intended to respond.  *See* P.R. 54.  CEK again failed to respond to CBP.

Like CEK, NWH submitted several incomplete responses to CBP's RFI.  NWH filed its

first response on February 24, 2021, however CBP rejected that submission because NWH had

failed to answer many questions in the RFI.  *See* Initial Rejection of NWH's RFI Response

(P.R. 50).  On March 3, 2021, NWH filed its second response to the RFI, however CBP rejected

this submission because NWH still failed to answer many questions in the RFI.  *See* Second

Rejection of NWH's RFI Response (P.R. 52).  NWH filed its RFI response for a third time on

March 10, 2021.  *See* NWH RFI Response (C.R. 33, 37–39; P.R. 53, 71–73).  Included in that

response were surveillance videos of NWH's purported operations in Thailand.  *See* NWH RFI

Response Exhibit 17.8 (P.R. 71–73).

On March 23 and 25, NWH submitted voluntary factual information, comprising of

additional videos of its operations in Thailand.  *See* New Factual Information Submitted by

NWH (P.R. 56).  On the last date for submitting new factual information, April 2, 2021, M&B

submitted voluntary factual information.  *See* M&B New Factual Information (P.R. 55).  NWH

and CEK both submitted several rebuttal submissions including surveillance videos of NWH's

purported operations in Thailand.  CBP rejected most of these submissions because they

contained new factual information submitted after the deadline, rather than rebuttal information

responsive to the factual information that M&B submitted on April 2, 2021.  *See generally*

C.R. 34; P.R. 57–63.

On May 10, 2021, CEK and M&B each submitted written arguments and on May 25,

2021, each party submitted rebuttal written arguments.  *See* CEK's Written Arguments (C.R. 35;

P.R. 64); M&B's Written Arguments (P.R. 65); CEK's Rebuttal Arguments (C.R. 34, P.R. 66);

M&B's Rebuttal Arguments (P.R. 67).

    **C.  <u>Determination Of Evasion And Administrative Review</u>**

On September 16, 2021, CBP's TRLED issued its notice of determination as to evasion.

*See* TRLED Determination.  CBP determined that substantial evidence supports a determination

that the importers, including CEK, evaded AD duties by importing steel wire hangers into the

United States from China by transshipping through Thailand and falsely claiming the

merchandise was of Thai-origin.  In support of its evasion determination, CBP applied adverse

inferences against all the importers and NWH due to the failure of those parties to cooperate to

the best of their abilities.  *See generally* TRLED Determination at 50.  TRLED also determined

that, based on facts otherwise available on the administrative record, substantial evidence

supported a finding of evasion.  *Id.*

On October 29, 2021, CEK submitted a request for an administrative review.  *See* CEK's

Request for Admin. Review (P.R. 106–09).  On January 28, 2022, ORR issued a *de novo*

determination in which it affirmed TRLED's determination of evasion.  *See* Admin Review

Determination (P.R. 114).

CEK filed this action in the Court on March 11, 2022, challenging these CBP

determinations.  *See* Summons (ECF No. 1); Compl. (ECF No. 2).  No other party filed an action

challenging the determination.

<u>SUMMARY OF THE ARGUMENT</u>

CBP appropriately initiated this investigation in response to M&B's allegation, which

included robust information that "reasonably suggest{ed}" that CEK and the other importers

were engaged in evasion.  This information included that John Liu, the owner of CEK, and NWH

were both connected to other entities alleged or found to be evading the AD order on hangers

8

from China in related EAPA investigations, that imports of steel wire hangers to the United States from Thailand were drastically fluctuating, and that information concerning NWH indicated that it was not manufacturing in Thailand all the hangers that were exported to the United Stated States by the importers at issue.  CEK's arguments to the contrary offer contrary interpretations of the information included in M&B's allegation, but these arguments ignore that the statutory design of EAPA necessitates that CBP will initiate an investigation if the information in the allegation reasonably suggests evasion, and the statute does not require that the agency first develop a robust record.  CEK's challenges to initiation lack merit.

Further, CBP's evasion determination is supported by substantial evidence.  Neither NWH nor CEK cooperated to the best of their abilities, resulting in significant gaps in the administrative record.  Nevertheless, the record evidence that was available provides substantial evidence that CEK imported Chinese-origin steel wire hangers into the United States by transshipping the hangers through Thailand.  CEK inappropriately focuses on select pieces of evidence in an attempt to undermine CBP's determination, but fails to substantiate its claims that the steel wire hangers at issue were produced by NWH in Thailand.

Finally, CEK raises several procedural arguments concerning the investigation.  These arguments lack merit and do not establish that CEK lacked any opportunity to be heard concerning evidence on which CBP relied in its determination.

The Court should affirm CBP's decision to initiate this investigation and its determinations that CEK evaded AD duties on steel wire hangers from China.

**ARGUMENT**

## I.    <u>Standard Of Review</u>

Pursuant to 19 U.S.C. § 1517(g)(1), an interested party may seek judicial review of TRLED's evasion determination and ORR's *de novo* administrative review.  The Court will

9

review these determinations by examining whether CBP "fully complied with all procedures" and "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1517(g)(2).  Additionally, the Court's review of CBP's determinations "may encompass interim decisions subsumed into the final determination." *All One God Faith, Inc. v. United States*, 589 F.Supp.3d 1238, 1246–47 (Ct. Int'l Trade 2022).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency{.}" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In reviewing the agency's explanation, the Court will consider whether an agency's determination "examined 'the relevant data' and articulated 'a satisfactory explanation' for {its} decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, _U.S._, 139 S. Ct. 2551, 2569 (2019) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29 at 43)).

## II.    CBP Properly Initiated The Investigation In Accordance With Its Regulations

CEK asserts that CBP failed to satisfy the regulatory criteria for initiation under 19 C.F.R. § 165.11(b) because, CEK asserts, M&B's request "was inadequate on its face" and the information included in the allegation did not "reasonably suggest" that the covered merchandise had been entered into the United States through evasion.  Pl.'s Br. 3; 11–13.  These arguments lack merit.

### A.   CEK's Initiation Challenges Are Contrary To The Statutory Design Of EAPA Investigations

CEK complains that "CBP did not notify CEK of the filing of the allegations" or of initiation of the investigation (Pl.'s Br. 5), however the statutory scheme in place reflects that an importer has no right to be informed at the time of the allegation or initiation.  In fact, any notice

10

to the importer that an allegation was submitted may have very well thwarted the investigation

by allowing the importer an opportunity to alter its behavior and redirect its shipments.

Moreover, neither the statute, nor the applicable regulations, provide a subject importer with an

opportunity to submit comments concerning initiation of an EAPA investigation.  *Cf Diamond*

*Tools Tech. LLC v. United States*, 545 F.Supp.3d 1324, 1341 (Ct. Int'l Trade 2021) (rejecting an

importer's challenge to CBP's interim measures and recognizing that the statute authorizes CBP

to impose interim measures without prior disclosure to a party under investigation).

The EAPA statute authorizes CBP, as a law enforcement agency, to take aggressive and

early action to investigate allegations of evasion.  The applicable statute provides that CBP is

*required* to initiate an investigation when the information in the allegation reasonably suggests

that the relevant merchandise has been entered into the United States through evasion without

directing that CBP first provide a subject importer with the opportunity to comment on the

allegations.  *See* 19 U.S.C. § 1517(b)(1); *cf.* 19 U.S.C. § 1673a(c)(4)(E) (providing interested

parties with an opportunity so submit comments before Commerce initiates an AD/CVD

investigation).  CEK cannot complain that it did not receive notice or an opportunity to comment

on initiation where neither the applicable statute nor regulations afford it such a right.  *See*

*generally Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d

1239, 1250 (Fed. Cir. 1985) ("A protectable interest must be more than a unilateral

expectation").

Additionally, at times CEK appears to suggest that CBP's decision to initiate the

investigation must be supported by substantial evidence.  *See* Pl.'s Br. 3 ("The allegation filed

with CPB . . . provided no evidence, let alone substantial evidence of evasion of the order.")

However, that is not the applicable standard.  Congress created a low evidentiary standard for

determining whether to initiate an investigation in response to an allegation.  CBP's determination to initiate an investigation is governed by 19 U.S.C. § 1517(b)(1), which instructs that CBP, within 15 days of receiving the allegation, "*shall* initiate an investigation if {CBP} determines that the information provided in the allegation . . . *reasonably suggests* . . . evasion." 19 U.S.C. § 1517(b)(1) (emphasis added).  Congress then instructed that CBP "shall" impose interim measures within 90 days of initiation, if it determines based on the investigation that "there is a *reasonable suspicion*" of evasion.  19 U.S.C. § 1517(e).  Finally, the statute directs CBP to reach its final evasion determination "based on *substantial evidence*{.}"  19 U.S.C. § 1517(c)(1)(A) (emphasis added).  In other words, Congress provided three different standards for CBP to evaluate evidence of evasion, standards that reflect the development of information during the course of the investigation.[5]

CEK's remaining arguments concerning initiation are essentially counterpoints to suggest other interpretations of information provided in the allegation.  However, the EAPA process, by design, directs CBP to evaluate the allegation on its face and then, if the agency initiates an

---

[5] The statute does not define "reasonably suggests."  However, the phrase appears in at least one other statutory context.  In 21 U.S.C.A. § 360i, Congress directed the Food and Drug Administration (FDA) to pass regulations requiring a device manufacturer or importer to report whenever it "receives or otherwise becomes aware of information that reasonably suggests that one of its marketed devices (a) may have caused or contributed to a death or serious injury, or (b) has malfunctioned and that such device or a similar device marketed by the manufacturer or importer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur . . . ."  Similar to the EAPA context, the reporting obligation in this statute involves a threshold issue concerning whether to report information in a device manufacturer or importer's possession.  The use of the phrase "reasonably suggests" in this context is not used to describe a final determination based on a completed review.

Likewise, the "reasonable suspicion" standard does not require that CBP make an ultimate determination as to evasion that is supported by substantial evidence.  *See Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968) ("The reasonable suspicion must be based on 'specific and articulable facts,' which, when taking into account 'the totality of the circumstances—the whole picture,' leads a reasonable police office to conclude 'that criminal activity *may* be afoot.'") (emphasis added).

investigation, weigh evidence and arguments submitted by interested parties during the course of that investigation.  *See* 19 C.F.R. § 165.11(b) (reflecting that the information available in the allegation will necessarily be limited to "{i}nformation reasonably available to the interested party" who files the allegation); 19 C.F.R. § 165.23(c) (describing the development of the administrative record during the investigation, including written arguments by interested parties).  Given the directive in 19 U.S.C. § 1517(b)(1) that CBP "shall" initiate an investigation if the agency determines that the information included in the allegation "reasonably suggests" evasion, the agency would risk non-compliance with the statute if it did not initiate an investigation based on speculation that an importer may offer contrary rebuttal information or arguments during the investigation.  The Court should reject these challenges to initiation, which, as described below, also lack merit.

**B.   CBP Based Its Initiation Decision On Information In The Allegation That "Reasonably Suggests" Evasion**

In the Initiation Notice, CBP summarized key information provided in M&B's allegation.  *See* Initiation Notice at 1–4.  CBP did not rely on any one piece of information contained in the allegation; rather CBP "assess{ed} the totality of circumstances and evidence provided in the allegation" in determining that information contained in the allegation "reasonably suggests" that CEK engaged in attempts to evade the Order.  *See* Initiation Notice at 5 (citing 19 U.S.C. § 1517(b)(1)).  These circumstances are summarized below.

**1.   Related EAPA Investigations And Import Trends**

CEK challenges background data summarized by CBP in connection with M&B's allegation that "the owner of CEK has a history of transshipping hangers to avoid AD duties" (Initiation Notice at 3).  *See* Pl.'s Br. 11–14.  As described by CBP in its Initiation Notice, M&B identified several ongoing and completed EAPA investigations involving alleged transshipment

of steel wire hangers from China, several of which involved entities with known connections to CEK's owner, Zhe "John" Liu.  *See* CEK Allegations at 4; Initiation Notice at 3–4.

First, M&B identified EAPA Consol. Case No. 7191, in which CBP determined that a number of importers were transshipping Chinese-origin steel wire hangers through Malaysia.[6] M&B alleged that one of those importers, Garment Cover Supply, is managed by John Liu.[7]  *See* CEK Allegations at 10 (describing annual reports filed with the State of Florida); Notice of Initiation at 4.

Second, M&B identified EAPA Cons. Case No. 7379, in which CBP investigated whether a number of importers were transshipping Chinese-origin steel wire hangers that the importers purported were manufactured in India by Kaylee International Pvt. Ltd. (Kaylee).[8] M&B alleged that one of those importers, AB MA Distribution Corporation (AB MA), has several connections to CEK.  Specifically, M&B alleged that CEK and AB MA use the same residential home in Winter Park, Florida as a mailing address, which is also CEK's principal

---

[6] Notice of Final Determination as to Evasion, EAPA Consol. Case No. 7191 (Mar. 15, 2018), https://www.cbp.gov/sites/default/files/assets/documents/2018-Mar/2CMPFinal%20Determination%20EAPA%20Cons.%20Case%20No.%207191%20-%20PV.pdf

[7] Another one of those importers, GL Paper Distribution, LLC, is the importer involved in *United States v. Liu*, which is currently pending before the Court.  The relationships between John Liu, Garment Cover Supply, GL Paper, AB MA, as well as several other entities, is described in the government's complaint in *United States v. Liu et al* (Court No. 22-00215).  *See* Complaint ¶¶ 4–10 (ECF No. 2) (Court No. 22-00215).  As alleged in that complaint, it is the government's contention that Liu used these companies to direct and abet the importation of steel wire hangers through circumvention.  *See Id.* ¶ 4–10.  That complaint also details a pattern by which Liu created new companies and then dissolved those companies in response to site visits by CBP and EAPA investigations.  *Id.* ¶ 16–22.

[8] CBP ultimately made an affirmative evasion determination.  *See Notice of Determination as to Evasion*, EAPA Cons. Case No. 7379 (Sept. 23, 2020), www.cbp.gov/sites/default/files/assets/documents/2020-Oct/09-23-2020%20-%20TRLED%20-%20Final%20Determination%20%28508%20Compliant%29%20-%20%28Cons%20Case%207379%29%20-%20PV.pdf.

place of business.  *See* Initiation Notice at 3 (citing CEK Allegations at Exhibit 11 (AB MA

Corporate Information), Exhibit 13 (Orange County Parcel Search Results), Exhibit 15 (CEK

Corporate Information); *see also* CEK Allegation 9–10.  M&B also provided import data

reflecting that NWH may have "trading relationships" with Kaylee.  *See* CEK Allegations at 7,

Exhibit 9 (import data on NWH in *ImportKey*, a trade data subscription service); Initiation

Notice at 3.[9]

M&B also provided information concerning imports of steel wire hangers from Thailand

to the United States, which M&B alleged were made by a "small group" of importers, several of

which were affiliated with Zhe "John" Liu and/or other entities involved in EAPA investigations

on steel wire hangers from other countries.  *See* CEK Allegations 8–11, Conf. Exhibit 4

(providing an analysis of import data from Thailand in *Datamyne*, a trade data subscription

service).  M&B described EAPA Case No. 15135/7175, in which CBP determined, in August

2017, that certain Chinese-origin steel wire hangers were transshipped through Thailand.[10]

M&B provided evidence that beginning in February 2017, while EAPA Case No. 15135/7175

was underway, imports of steel wire hangers into the United States from Thailand stopped for a

12-month period.[11]  *See* CEK Allegations at 3.  Imports of hangers from Thailand to the United

---

[9] M&B also identified EAPA Cons. Case No. 7357, KSA Supply Corporation and other
importers were alleged to be transshipping Vietnamese-origin hangers by transshipping through
the Lao People's Democratic Republic (Laos).  *See Notice of Determination as to Evasion,*
EAPA Cons. Case No. 7357 (Oct. 26, 2020).  KSA is one of the non-participating importers in
the EAPA determination challenged in this case.

[10] Notification of Final Determination as to Evasion, EAPA Case No. 15135/7175 (Aug. 14,
2017), https://www.cbp.gov/sites/default/files/assets/documents/2017-
Aug/Notice%20of%20Final%20Determination%20of%20Evasion%20EAPA%20Case%207175
%20%28P%29.pdf (involving Eastern Trading NY Inc.).

[11] Beginning in December 2016, CBP imposed interim measures on entries of steel wire hangers
to the United States from Thailand that were at issue in EAPA Case No. 15135/7175.  *See*
Notification of Final Determination as to Evasion, EAPA Case No. 15135/7175.

States resumed in March 2018, and shipments to the United States of steel wire hangers from

NWH began in January 2019. *See* Initiation Notice at 2; CEK Allegations at 3–4. M&B also

provided import data reflecting that AB MA imported steel wire hangers from NWH during the

period from January 2019 to April 2019. *See* CEK Allegations at 3–4, Exhibit 12 (*Datamyne*

Report on Imports by AB MA). CEK began importing steel wire hangers from NWH in

Thailand in June 2019, only after AB MA stopped doing so. *See* CEK Allegations, Exhibit 14

(*Datamyne* Report on Imports by CEK Group). M&B also provided evidence suggesting a

pattern of companies affiliated with John Liu closing after being implicated in an EAPA

investigation. Specifically, M&B provided evidence that Garment Cover Supply was dissolved

on February 15, 2017, while EAPA Consol. Case No. 7191 was underway. *See* CEK Allegation

at 9. M&B also provided evidence that AB MA was voluntarily dissolved in January 2020,

while EAPA investigation EAPA Cons. Case No. 7379 was still underway. *See* CEK Allegation,

Exhibit 11.[12]



CBP also described M&B's allegation that there are ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ *See* Initiation Notice at 2. M&B argued

████████████████████████████████████████████████

---

[12] The relationships between John Liu, Garment Cover Supply, GL Paper, AB MA, as well as
several other entities, is described in the government's complaint in *United States v. Liu et al*
(Court No. 22-00215). *See* Complaint ¶¶ 4–10 (ECF No. 2) (Court No. 22-00215). As alleged
in that complaint, it is the government's contention that Liu used these companies to direct and
abet the importation of steel wire hangers through circumvention. *See Id.* ¶ 4–10. That
complaint also details a pattern by which Liu created new companies and then dissolved those
companies in response to site visits by CBP and EAPA investigations. *Id.* ¶ 16–22.

████████████████████████████████████████

████████████████████████████████████

████████████████████   *Id.* at 2.  CBP described M&B's allegation that "these general import trends, the high dumping rates imposed on Chinese hangers" and the EAPA investigations described above, paired with "the significant increase in imports of hangers from Thailand was likely due to transshipping of Chinese hangers to avoid applicable AD duties."  *Id.* at 2.

Based on this information available to CBP at the time of its initiation, CBP determined that these import trends and related EAPA investigations reasonably suggested evasion.  CEK's arguments concerning these import trends and other EAPA investigations are unconvincing.

CEK characterizes M&B's descriptions of these other EAPA investigations as "an attempt to smear NWH with actions by unrelated parties in other EAPA cases."  Pl.'s Br. 17.  CEK's assertion that these other EAPA investigations involve "unrelated parties" is contrary to information placed on the record by M&B and by the filings in these other EAPA investigations.  CEK offers no specific arguments rebutting the connections to the other EAPA investigations alleged by M&B.  CEK seems to acknowledge that AB MA is the importer responsible for the first U.S. imports from NWH in Thailand, as M&B alleged.  *See* Pl.'s Br. 17.  Likewise, CEK does not deny that AB MA is affiliated with Zhe "John" Liu.  Instead, CEK asserts that this connection offers "no evidence of circumvention by CEK" because "{t}hat an importer would change from one supplier to another is not an indication of transshipment of a supplier, it is merely an indication of the need for supply for the importer's business."  Pl.'s Br. 17–18.  Finally, CEK asserts that the fact that "the hangers were imported by a small group of importers" has no connection to whether those hangers are transshipped.  *See* Pl.'s Br. 20.

CEK's arguments do not contradict the connections to other EAPA investigations and import trends identified by M&B. Instead, CEK argues that importers looking to source supply of steel wire hangers may do so from a variety of sources, "which is a normal behavior of rational business seeking to supply products{.}" That there might be a rational explanation for the information provided by M&B does not negate that CEK's extensive connections to other entities implicated in EAPA's investigations, and the other import trends identified by M&B, reasonably suggest evasion. Moreover, as discussed above, the Court must evaluate CBP's decision to initiate based on the information readily available to CBP on the face of M&B's allegation. And that information more than reasonably suggests that CEK was evading duties on steel wire hangers by transshipment through Thailand. To the extent there were rational business explanations for the import trends that M&B identified in its allegation, CEK had the opportunity to make those arguments during the course of CBP's investigation. Instead, CEK, along with NWH and the other importers, opted to withhold information during the course of the investigation, as described in more detail below.

In addition, CEK argues that many hangers are imported from Thailand to the United States that are not implicated in the EAPA investigation, and that CEK is not the largest importer of steel wire hangers from Thailand, which CEK asserts undermines the evasion determination because "evasion is alleged in large part based on the total volume of shipments." Pl's Br. 54. However, this argument is misguided because CBP did not make its decision to initiate an investigation based on volume of shipments.

**2.  Evidence That Hangers Exported From Thailand Were Likely Produced In China**

In its Initiation Notice, CBP described that M&B provided evidence that the hangers exported by NWH from Thailand were likely produced in China. Initiation Notice at 2. CEK

argues that this evidence did not reasonably suggestion evasion, and in fact was evidence of

NWH's production of steel wire hangers in Thailand.  *See* Pl.'s Br. 14.  These attempts to point

out potential explanations for individual pieces of evidence does not undermine CBP's decision

to initiate an investigation.  As described above, in initiating the investigation, CBP described

that it "assess{ed} the totality of circumstances and evidence provided in the allegation" in

determining that there was a reasonable suggestion that CEK engaged in attempts to evade the

Order.  *See* Initiation Notice at 5; *see also* TRLED Determination at 45 ("CBP disagrees with

CEK's contention that allegations should be examined in a vacuum, and no other information

may be considered by CBP when evaluating an allegation{.}")



First, M&B provided a ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████.  *See* Initiation Notice at 2.  Specifically, M&B observed that ████████████

████████████████████████████████████████████████████

██████████████████████████████████████████.  *Id.*  M&B also

described that a corresponding document indicated that ████████████████████████

████████████████████████████████████  *See* CEK Allegation at 5 and

Exhibit 5.  CEK challenges that this ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████  However, as CBP recognized in its evasion

determination, "a ████████████████████████████████████████

████████████████████████████████ and would provide a reasonable suggestion

that NWH may have sourced more hangers from China."  TRLED Determination at 47.

Second, in its Initiation Notice, CBP described evidence identified by M&B from the website of the Thai Ministry of Commerce, Department of Business Development (DBD).  *See* Initiation Notice at 3.  Specifically, M&B described that "{a}lthough NWH was established in June 2018, the company has not submitted any financial data to the Thai Government."  CEK Allegations at 6.  CEK offers several theories as to why there is no financial data from NWH on the website, including the unsupported assertions that all Thai companies may not be required to submit financial information or that companies might have the option of keeping financial information private.  Pl.'s Br. 16.  Even if these explanations are accurate, and CEK offers no support to indicate that they are, such potential explanations do not negate the weight of this evidence at the initiation stage of CBP's investigation.  In any event, CEK submitted no information on the administrative record to support these arguments.

Third, CBP noted M&B's allegation that "NWH classified itself to the Thai government as a company which sells wholesale goods on a fee or contract basis" (Initiation Notice at 3) because NWH's information filed with the DBD website reflects the company's selection of Standard Industrial Classification (SIC) system code 46109, which covers "'{w}holesale on a fee or contract basis of a variety of goods'" (CEK Allegation at Exhibit 7).  CEK Allegation at Exhibit 8.  M&B had also observed that there is an SIC code indicative of the manufacturing of steel wire products, code 2599, which encompasses the manufacture of other fabricated metal products not elsewhere classified, including "manufacture of articles made of wire."  CEK Allegation at Exhibit 8.  CEK offered CBP no administrative record evidence that the SIC Code was not an error.  Nor has CEK made any such arguments before the Court.  Instead, CEK asserts that the SIC code "is self-selected" and "not verified by the Thai Government."  Pl.'s Br. 17.  Then without support, CEK asserts that the SIC code "serves no meaningful purpose

{and} appears to have been mis-selected." This argument does nothing to impeach this record evidence in CBP's decision to initiate an investigation, especially in light of the other information alleged by M&B.

Fourth, CBP described that M&B provided information concerning Shaoxing Maosheng, a company that advertised on a Made-in-China website stating that its hanger products are exported to the United States. *See* Initiation Notice at 4. M&B stated that Shaoxing Maosheng does not have its own AD rate under the Order and so any shipments of hangers from Shaoxing Maosheng to the United States would be subject to the China-wide rate of 187.25 percent. *Id.* The Made-in-China website also indicates that the general manager of Shaoxing Maosheng is a "Mr. Tu." M&B speculated that it was possible that the "Mr. Tu" at Shaoxing Maosheng was the same person as the owner and director of NWH, Mr. Zhongming Tu, because they each have addresses in Yuecheng District, Shaoxing City, Zhejiang Province in China. *Id.* CEK makes several arguments concerning Shaoxing Maosheng's profile on the Made-for-China website and argues that Tu is a common name and that this connection is therefore "attenuated." Pl.'s Br. 18–19. These arguments do not undermine CBP's ultimate conclusion that the evidence included in M&B's allegation, taken as a whole, reasonably suggested evasion. Neither CBP in its initiation determination, nor M&B in its allegation, concluded that the Mr. Tu involved in Shaoxing Maosheng was definitely Mr. Zhongming Tu, the owner of NWH.

Fifth, CEK complains that M&B's claim that there were "substantial unpaid duties" is "based on faulty assumptions" because "{t}here would only be 'substantial unpaid duties' if, in fact, transshipping were occurring." Pl.'s Br. 20–21. However, M&B did not argue that "substantial unpaid duties" were evidence of transshipment, but rather as part of its request to CBP that the agency expand the period of investigation to cover the time when NWH began

operating in Thailand, January 2019.  *See* CEK Allegation at 13.  In any event, CBP did not make its initiation decision based on this.  As such, these arguments do not actually challenge CBP's determination to initiate an investigation.

Finally, CEK raises several arguments concerning a "market report" that M&B included in its allegations.  In the Notice of Investigation, CBP described that M&B employed a foreign market researcher to collect corporate information and conduct a physical inspection of the reported business location of NWH.  *See* Initiation Notice at 3.  As described by CBP, "the foreign market researcher noted ███████████████████████████████████████████ ████████████████" *Id.*  In addition, ███████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████  *Id.*

CEK argues that the market research report, contained no evidence of any kind of evasion of the order, and to the contrary, the market report contained evidence of actual production.  Pl.'s Br. 5; *see also* Pl.'s Br. 21–24.  CEK's arguments on this issue offer alternative explanations for the observations made by the market researcher.  CEK's arguments once again ignore that an EAPA allegation is necessarily limited to "{i}nformation reasonably available to the interested party to support its allegation{.}"  19 C.F.R. 165.11 (b).  So, although the market research report may have offered a preliminary view of NWH's operations, that is to be expected at the initial stages of an EAPA investigation.  For example, CEK complains that the market researcher did not make an appointment at the NWH facility but instead showed up unannounced.  Pl.'s Br 22.  However, it is unreasonable that M&B could have made an appointment or would have a basis to

collect more detailed information concerning operations of NWH, a company with which it is not affiliated.

As to CEK's assertion that the market report offers evidence of production, for example, because the report contains "photographs {that} show hangers outside of a box waiting to be packaged," (Pl.'s Br. 24), these arguments lack merit.  CEK's arguments do not identify evidence in the market research report that the NWH facility was producing the hangers imported to the United States that are at issue in the investigation, and so they do not offer a reason why CBP should not have initiated an investigation in light of information in the report and the other evidence in the allegation that reasonably suggested evasion.

***

CEK's fragmented arguments concerning initiation miss the point that CBP's decision to initiate an investigation is a threshold determination, based on whether evidence "reasonably suggests" evasion, rather than a determination of evasion supported by substantial evidence. Here, CBP's decision to initiate an investigation is supported by robust information that more than reasonably suggested evasion.  As such the decision to investigate was not an abuse of discretion.

### III.  CBP's Determination That Covered Merchandise Entered The United States Through Evasion Is Supported By Substantial Evidence

In its ultimate determination in the EAPA investigation, CBP concluded that the importers entered Chinese steel wire hangers into the United States through evasion by listing the country of origin as Thailand, rather than China, in the entry documents.  CBP's ORR affirmed that determination after its own *de novo* review.  Those determinations are supported by substantial evidence on the record.

23

### A.  **CBP's Application of Adverse Inferences Is Warranted**

None of the importers involved in the consolidated EAPA investigation, including CEK, and the manufacturer involved, NWH, cooperated to the best of their abilities.  Because this lack of cooperation resulted in significant gaps in the available record, CBP reasonably determined that it would apply adverse inferences to all the entities at issue in the EAPA investigation.

### 1.  **CBP Properly Found That CEK And NWH Failed To Cooperate To The Best Of Their Abilities.**

Both CEK and NWH failed to provide complete and adequate responses to CBP's requests for information, despite repeated requests from CBP and repeated warnings that failure to provide complete responses could result in the application of adverse inferences.  *See* TRLED Determination at 7 (describing CBP's attempts to collect information).

CBP determined that CEK's CF28 response included "multiple discrepancies and is not complete" and therefore that CBP could not "rely on the information contained in the CF28 response {from CEK} to determine where the imported hangers were manufactured."  *See* Notice of Initiation and Interim Measures at 7–13 (detailing the deficiencies in the CF-28 responses).  CBP recognized that "CEK provided some photographs of NWH's facility in Thailand and a factory profile, but did not provide production capacity, inventory records, sales records, turn-around times for orders, the names of the owners and corporate officers, or employee time cards, as requested by CBP."  *Id.* at 7.  Additionally, CEK's response did not include mill certificates, certificates of origin, or an affidavit from the manufacturer, as requested by CBP.  *Id.* at 8.  CBP observed that although CEK provided a receipt for NWH's purchase of wire rope, the amount listed did not match the corresponding purchase order.  *Id.* at 9.

CBP sent its RFI to CEK on January 28, 2021.  In the initial RFI, CBP explained,

> Please respond to each question.  If a particular question does not
> apply, please state so, and explain why in your response.  Failure

to respond to each question could lead to the use of adverse
inferences for that particular question.

RFI to CEK (C.R. 1; P.R. 1).  The RFI contained four parts, requesting information about

(1) CEK's corporate structure and affiliations; (2) CEK's accounting and financial practices;

(3) CEK's procurement and sales practices; and (4) CEK's sales reconciliations.  *See id.*  In the

cover letter, CBP warned that it could apply an adverse inference to CEK and select from among

the facts otherwise available if CEK failed to cooperate to the best of its ability.  *Id.* at 2–3.

CEK provided its response to the RFI on February 25, 2021, but CEK provided responses

to only certain questions.  *See* CEK's RFI Response (C.R. 31; P.R. 49).  As a result, CBP issued

a supplemental RFI to CEK on February 26, 2021.  *See* Supplemental RFI to CEK (C.R. 32, P.R.

51).  In the cover letter and in each of the four sections of the RFI, CBP again instructed that the

agency could apply adverse inferences if CEK failed to respond to questions in the questionnaire.

*Id.*  CEK did not respond to the supplemental RFI.  On March 10, 2021, CBP requested that CEK

confirm that it had received the supplemental RFI or indicate whether it intended to not respond

to the supplemental RFI.  *See* CBP's Email (P.R. 54).  Again, CEK failed to respond.

Like CEK, NWH provided only partial responses to CBP's requests for information

despite CBP granting NWH several opportunities to submit information and granting NWH

several extensions of time.[13]  CBP first issued an RFI to NWH on January 27, 2021.  *See*

Producer RFI (C.R. 26; P.R. 41).  On February 24, 2021, NWH submitted an incomplete RFI

response and did not answer certain questions, stating the responses to those questions were "in

progress."  CBP rejected the submission on February 25, 2021 and granted NWH an additional

---

[13] On February 12, 2021, NWH requested an extension of time to respond to the initial RFI (P.R.
42), in response to which CBP granted NWH until February 24, 2021 at 5:00 pm (EST),
(P.R. 43).

seven days to complete and resubmit its RFI response.  *See* Initial Rejection of NWH's RFI

Response (P.R. 50).  CBP instructed that it could apply adverse inferences if NWH failed to

respond to questions in the questionnaire.  *Id.*  CBP also warned that "{s}tatements included

within a questionnaire response regarding ongoing efforts to collect the requested information or

promises to supply missing information when available in the future, do not substitute for a

written extension request."  *Id.*

On March 3, 2021, NWH resubmitted its second incomplete RFI response, and again

answered certain questions by stating that responses were "in progress," or by providing not

responsive information.  *See* TRLED Determination at 11.  CBP again rejected this submission

describing the deficiencies in the response and reiterating that the agency could apply adverse

inferences if NWH failed to respond to the questions.  *See* Second Rejection of NWH's RFI

Response (P.R. 52).  CBP granted NWH an additional seven days to complete its RFI response.

*Id.*  NWH filed its RFI response for a third time on March 10, 2021.  *See* NWH RFI Response

(C.R. 33, 37–39; P.R. 53, 71–73).  However, this response was still missing extensive categories

of requested information.

In its determination, CBP's TRLED office described significant gaps in the information

provided by NWH and CEK.  *See* TRLED Determination at 12–21.  With regard to CEK's RFI,

CBP found that CEK did not provide any answers to questions in two of the sections

("Accounting/Financial Practices" and "Sales Reconciliations") and answered only some

questions in the remaining two sections ("Corporate Structure" and "Procurement and Sales

Practices").  *See* TRLED Determination at 9.  CBP found that "{o}f the approximate 74

questions and their sub-parts found in the RFI, CEK answered 23."  *See id.* at 10.

With regard to NWH's RFI, CBP found that NWH did not provide answers to most questions concerning NWH's accounting and financial practices.  CBP observed that "NWH provided no narrative to explain any of its accounting practices, nor did it provide any financial records, with the exception of a subledger for one account number." *Id.* at 15.  Of the approximately 29 questions (that is, questions and their sub-parts) that CBP asked NWH concerning its accounting practices, NWH answered one.  *See* TRLED Determination at 14. NWH also failed to adequately respond to the "Sales and Production Reconciliations" section of the RFI, including key issues related to production capacity.  *See id.* at 15–22.  CBP also found that NWH answered one of the approximately nine general questions that CBP asked with respect to NWH's sales and production reconciliations, and that NWH answered 8 of the approximately 136 specific questions tied to certain entries.  *See id.* at 18.  CBP concluded that the use of adverse inferences as to CEK and NWH was warranted under these circumstances. TRLED Determination at 8 (citing 19 U.S.C. § 1517(c)(3)(A) and 19 C.F.R. § 165.6)).

## 2.   CBP's Application of Adverse Inferences Is In Accordance With Law.

CEK acknowledges "that neither NWH nor CEK responded to every question presented by CBP{.}"  Pl.'s Br. 44.  CEK did not offer CBP any explanation as to why it did not respond to large sections of CBP's requests for information, nor does CEK offer the Court any explanation as to why it could not provide the requested information, only that CEK "did not find it necessary to address the remaining questions and requests made by CBP as the requested information is not necessary for finding of the absence of transshipment."  Pl.'s Br. 30.  CEK cites no authority for the implication that a party responding to an agency's questionnaires can ignore certain requests for information because that party unilaterally determines that the information is not "necessary" to the agency's investigation.  Nevertheless, CEK asserts that CBP should not have applied adverse inferences because CEK's and NWH's "responses

addressed all of the necessary information" and that "information not supplied in {CEK's} response is ultimately irrelevant to CBP's AD/CVD evasion and transshipment analysis."  Pl.'s Br. 30.  In other words, CEK's defense for its undisputed failure to respond to CBP's repeated requests for information is that it had the right to choose unilaterally what information it considered relevant to the investigation and would provide in response to CBP's questionnaires . This argument is baseless.

CEK's suggestion that it had the option to respond to only those questions that it deemed relevant is contrary to the applicable statute.  The EAPA statute provides that if a party "has failed to cooperate by not acting to the best of the party or person's ability to comply with a request for information, {CBP} may, in making a determination {of evasion}, use an inference that is adverse to the interests of that party or person in selecting from among the facts otherwise available to make the determination."  19 U.S.C. § 1517(c)(3); *see also* 19 C.F.R. § 165.6(a) (CBP may apply an inference adverse to a party that "fails to cooperate and comply to the best of its ability with a request for information made by CBP").  Thus, both the statute and implementing regulations provide that CBP may apply an adverse inference to a party that fails to respond to the best of its ability to questions from CBP.  Neither the statute nor the regulations permit a responding party to unilaterally decide what information is necessary for the agency to conduct its investigation.

CEK's arguments are also contrary to the fundamental principle in administrative law that the agency is charged with conducting its own investigation.  *See, e.g.*, *MidContinent Nail Corp. v. United States*, 949 F.Supp.2d 1247, 1278 (Ct. Int'l Trade 2013) (describing "broad discretion" for "agencies with statutory enforcement responsibilities").  It is well-established in the context of AD/CVD proceedings, that a party "demonstrate{s} less than full cooperation"

when the importer "reported only information that it deemed necessary and sufficient." *Hyundai Heavy Indus., Co. v. United States*, 399 F.Supp.3d 1305, 1312–13 (Ct. Int'l Trade 2019), *aff'd*, 819 F. App'x 937 (Fed. Cir. 2020) (citing *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003)).  And the Court has affirmed that such selective production of requested information supports the application of adverse inferences.  *Id.* at 1314.  In the EAPA context, the Court has likewise approved the application of adverse inferences when a party fails to cooperate.  *See All One God Faith*, 589 F.Supp.3d at 1248.

CEK also argues that its decision to ignore several requests for information was warranted on the ground that the requests exceeded CBP's authority under 19 U.S.C. § 1508. Pl.'s Br. 30.  As an initial matter, this argument is misguided because the questions issued to CEK as part of the EAPA investigation are governed by 19 U.S.C. § 1517(c)(2), not 19 U.S.C. § 1508.  Section 1517(c)(2) provides that CBP "may collect such additional information as is necessary to make the {EAPA} determination." 19 U.S.C. § 1517(c)(2).  Nor does CEK offer any examples of why the information sought by CBP would not be relevant to the EAPA investigation.  Additionally, as TRLED observed in its determination, the importers in this consolidated EAPA investigation all received identical RFIs and the questions included in those RFIs have been asked in other EAPA investigations.  *See* TRLED Determination at 9.

Finally, CEK's arguments that the information it and NWH did not provide was not necessary for CBP's determination is incorrect.  CBP described several extensive gaps resulting from CEK's and NWH's failures to provide complete responses.  CBP described NWH's failure to respond to questions about the make and model of hanger making machines that NWH owns, information that could have permitted CBP to calculate production capacity.  *See* TRLED Determination at 22–23.  CBP also observed that it "does not have even a basic understanding of

29

how NWH's accounting system works, how costs and sales are tracked, how the inventory, production and sales accounting systems tie together, or even what accounts NWH keeps, with one exception." *Id.* at 15.  CBP observed that CEK's failure to fully respond to the RFIs "precludes CBP from performing the necessary analysis of its books and records to determine whether its imports of hangers entered the United States through evasion{.}" *Id.* at 8.

CEK also asserts that "there are no gaps to actual capacity and production occurring at NWH's facility" because information in CEK's RFI response together with NWH's RFI response provided adequate information concerning capacity.  Pl.'s Br. 44.  However, as TRLED explained in its determination, "an adverse inference may be used with respect to U.S. importers, foreign producers, and manufacturers 'without regard to whether another person involved in the same transaction or transactions under examination has provided the information sought.'" TRLED Determination at 8 (citing 19 U.S.C. § 1517(c)(3)(B)).  CBP then elaborated that it could still apply adverse inferences to CEK for not cooperating to the best of its ability in answering the RFIs even though NWH provided some limited answers to its RFI questions.  *Id.* Similarly, in *All One God Faith*, the Court upheld the application to adverse inferences when the manufacturers at issue either failed to respond to RFIs or failed to provide most of the information requested in the RFIs.  589 F.Supp. at 1251.  Unlike here, the importers in *All One God Faith* did in fact cooperate with the investigation, but the Court upheld application of adverse inferences because the identified foreign manufacturers failed to cooperate to the best of their ability.  *Id.*  The Court instructed that the "{s}tatute provides that CBP may apply adverse inferences with respect to an interested party, importer, foreign producer or exporter, or foreign government where such party 'has failed to cooperate by not acting to the best of {its} ability to comply with a request for information.'"  *Id.* at 1250 (citing 19 U.S.C. §§ 1517(c)(2)(A),

1517(c)(3)(A). The Court added that "{s}uch inferences may be used with respect to such interested, party, importer, foreign producer or exporter, or foreign government 'without regard to whether another {party} involved in the same transaction or transactions under examination has provided the information sought.'" *Id.* (citing 19 U.S.C. § 1517(c)(3)(B)). The Court's holding in that case contradicts CEK's suggestion that a party can avoid adverse inferences by offering selective responses to requests for information from CBP and then relying on submissions from another party.

The Court should affirm CBP's determinations that it was necessary to apply adverse inferences because it is incontrovertible that both CEK and NWH, as CEK's manufacturer, failed to cooperate to the best of their abilities. As such, CBP did not abuse its discretion in applying adverse inferences.

## B.  CBP's Evasion Determination Is Supported By Substantial Record Evidence

Although CBP reasonably applied adverse inferences under these circumstances, CBP also examined the facts otherwise available on the record. Based on this information, CBP determined that substantial evidence demonstrated that the importers misrepresented the country of origin on their imports of hangers. *See* TRLED Determination at 50.

In support of its ultimate evasion determination, CBP relied on some of the information contained in M&B's allegation, which were discussed above. In particular, CBP concluded that NWH may have selected an SIC code "not indicative of manufacturing because it was not engaged in manufacturing" and that multiple interested parties or their owners/employees "have a history of engaging in evasion, as CBP found in other EAPA investigations." *See* TRLED Determination at 49–50. CBP also found that "{i}mports from Thailand by a small number of importers" was evidence of evasion when taken together with the facts that (1) there were no imports of hangers from Thailand before the period at issue in EAPA Case No. 7175, in which

CBP determined that there was substantial evidence that a company was importing steel wire hangers manufactured in China and transshipped through Thailand, and after that investigation all imports of steel wire hangers from Thailand to the United States stopped for 12 months; and (2) when imports of hangers from Thailand did resume, "CBP had already found a reasonable suspicion of evasion that the individuals involved were already engaged in evasion from other countries." *Id.* at 47.  CBP also observed that "CEK is John Liu's fourth company CBP has found to be engaged in evasion{.}"  *Id.*

CBP also examined NWH's record submissions related to NWH's sourcing of raw materials.  CBP observed that NWH did not offer any narrative concerning its raw materials and provided company information for one supplier, ███████████████████████████ a Chinese manufacturer of hangers.  *See id.* at 25.  CBP concluded that "{a}s NWH omitted any mention of three of its five suppliers of steel wire in its RFI response . . . , we are left to guess at the universe of NWH's suppliers of steel wire, which casts doubt on the accuracy of NWH's reported raw material purchases."  *Id.* at 26.

CBP described that NWH had provided invoices for ███████████████████████ ███████  and another Chinese supplier ███████████  but that record evidence indicated there were three additional suppliers as well for which NWH had failed to provide any information. *Id.* at 25–26.  CBP also "found several troubling discrepancies with respect to the invoices for steel wire provided by NWH{.}"  *Id.* at 27.  Specifically, CBP examined the invoices for the suppliers provided by NWH and identified several "identical errors appearing over and over on each of these seemingly unrelated companies' invoices and packing lists{.}  *Id.* at 28.  These issues and discrepancies CBP identified comparing NWH's CF28 and RFI responses, led CBP to

conclude that "NWH has altered the documents submitted to CBP, or that in the regular course of business keeps altered documents."  *Id.*

Additionally, CBP reasoned that "{a}s NWH did not fully translate its labor records, did not include all employees in its labor records, indicate how much labor was used to produce different hanger models or provide bank statements to support its labor costs, we find the labor data provided by NWH to be incomplete and unreliable."  *Id.* at 30.

Next CBP found that NWH admitted to importing semi-finished hangers from China during the POI.  *Id.* at 35 (citing NWH's RFI Response at Exhibit 8.3).  CBP described that Commerce had considered a similar issue and had determined that semi-finished wire hangers are covered by the AD order and that the importation of Chinese origin semi-finished wire hangers into a third country for completion into finished garment hangers prior to importation into the United States constitutes circumvention.  *Id.* (citing *Steel Wire Garment Hangers from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 76 Fed. Reg. 66,895 (Dep't of Commerce Oct. 28, 2011)).

CBP also found that "data from the Thai government indicates NWH imported ███████ of Chinese-origin hangers before the start of the POI (August 26, 2019)" and CBP placed on the record ██████████████████████████████████████ *Id.* (citing Thai Trade Statistics in the HSI Attaché Report (C.R. 61 at BC-004167)); *see also* C.R. 67, Attach. 1 (bills of lading). CBP concluded that given the quantity of hangers in inventory reported by NWH prior to the POI, "we find it highly probable that these Chinese-origin hangers were exported to the United States during the POI."  TRLED Determination at 36; *see also* Administrative Review Determination at 9.

Additionally, CBP found that NWH registered as a business in June 2018 and purchased equipment in 2018. *See* TRLED Determination at 36 (citing NWH's RFI Response at Exhibit 1 (BC-002118 – BC-002119), and Exhibit 19 (BC-003867 – BC-003898). However, CBP noted that "documentation from the Thai government clearly indicates the license for NWH's factory to operate was issued by the Thai government in October 2019, and that operations began on November 4, 2019." *Id.* at 49 (citing NWH's RFI Response at Exhibit 2.1). However, evidence submitted by M&B reflects that NWH's first shipment of hangers to the United States was in January 2019. *Id.* CBP also found that HSI personnel had witnessed NWH's machines operating in July 2019, but that HSI personnel were told by NWH employees "that NWH had just begun to operate its machines, despite having a large amount of inventory on hand." *Id.* at 49. CBP also described that based on its site visit, HIS found "that NWH's owners and employees did not seem to know its hours of operations, the number of machines currently online or the number of hangers NWH was able to produce." *Id.* at 45. All of this constitutes substantial evidence supporting CBP's determination of evasion.

Likewise, ORR affirmed that determination based on its own review of the administrative record. ORR found that the administrative record supports a finding of evasion, "primarily due to the lack of probative evidence to tie the purported production of wire hangers at NWH to imports of hangers by CEK into the United States." Admin. Review Determination at 7. ORR found that the administrative record lacked "a significant amount" of documentation "to properly trace the merchandise that was entered into the United States through the production process" and to "establish that CEK's imported hangers were of Thai origin." *Id.* ORR's observations included that "there are no formal purchase orders breaking down the types of wire hangers

ordered by the importer from the manufacturer and there is almost no evidence of payment of either deposits or balances from the specific importer to the manufacturer." *Id.*

ORR observed that NWH had "provided some invoices and packing lists for its shipments of wire hangers to the importers in the United States," and found the documents provided by NWH "do not provide a breakdown of all of the different types of wire hangers purchased in each order—they only show the total number of cartons and pieces of wire hangers" and that the invoices and packing lists also showed the same date. *Id.* at 7–8.  ORR also observed that the documentation provided by NWH not being fully translated into English "prevent{ed} a proper audit of the administrative record to trace the production of the wire hangers from raw materials to their importation into the United States." *Id.* at 8.  Next ORR found that "discrepancies within the provided documentation signal doubts with respect to their authenticity." *Id.*  Specifically, ORR observed that "the NWH monthly production document provided by CEK in response to the CF-28 does not mirror NWH's daily production logs for the same month." *Id.*  ORR also observed that "{b}oth the CEK-provided monthly production document and the NWH-provided daily production logs also do not denote the units of measure for the wire hangers apparently produced (i.e., cartons or individual wire hangers or the weight of the wire hangers)." *Id.*  ORR further found that "NWH's narrative of the production process further indicates that each shipment of wire hangers is made to order; however, the production logs appear to indicate that many different types of wire hangers are kept as inventory at NWH's facility and do not necessarily leave the facility close to the time of their production." *Id.* at 9.

ORR concluded that "{c}oupled with NWH's purchase of Chinese-origin semi-finished wire hangers {discussed in CBP's initial determination}, as well as its exclusive sourcing of raw materials from Chinese wire hanger manufacturers, during the period of investigation, a finding

that covered merchandise was entered into the United States is warranted." *Id.* at 10
(PR-003803).

CEK does not offer any arguments in response to these detailed findings and conclusions,
other than its challenges to the information provided in the allegation, which are discussed in the
preceding section.  Instead, CEK argues that "{b}ased on the information provided in NWH's
RFI response, the vast majority (99.86% by M&B's calculation) of the exported goods were
wholly produced by NWH's facility in Thailand."  Pl.'s Br. 34.  CEK described that it reached
this number by comparing the total gross weight of exported shipments from NWH bound for the
United States and comparing that to the weight of raw materials imported into Thailand.  *See id.*
at 35–36.  However, this argument ignores the possibility that NWH's imports of raw materials
could include semi-finished hangers from China, and CEK does not dispute that NWH imported
at least some semi-finished hangers (*see* Pl's Br. 37).  This argument also does not address
CBP's concerns about the credibility of the records concerning raw material purchases, as
described in TRLED's determination.  CEK's comparison of raw materials and final exports
from NWH therefore does not provide evidence that the hangers were produced in Thailand, as
CEK suggests it does.

CEK also argues that NWH had submitted adequate information concerning production
capacity, which shows that "the actual production is far from reaching the machinery's full
capacity{.}"  In support of this, CEK cites Exhibit 11 to NWH's RFI response, however, this
record information is a simple chart providing four categories of machinery and their alleged
capacity, without detailing the model numbers or any other information concerning this
machinery.  *See* NWH RFI Response at BC-003195.  As explained above, CBP had asked
questions about the make and model of hanger making machines that NWH owns, however,

NWH refused to provide this information.  *See* TRLED Determination at 20.  The conclusory

and non-detailed information provided by NWH concerning its production capacity does not

replace the detailed information that CBP requested, which could have permitted CBP to

determine production capacity.  Nor can CEK replace its own analysis of data while ignoring

CBP's requests for information that it requested to determine and to verify production capacity.

As the Court has recognized, EAPA "grants to Customs broad discretion in how it can collect

and verify information."  *Aspects Furniture Int'l, Inc. v. United States*, Ct. No. 20-03824, 2022

WL 17249645, at *20 (Ct. Int'l Trade Nov. 28, 2022) (citing §19 U.S.C.1517 (C)(2)).  Finally,

CBP also noted that during the site visit of NWH's facilities, NWH's two owners offered

significantly different estimates of production capacity.  *See* TRLED Determination at 30.

   Because CBP provided a reasoned analysis supported by substantial evidence, the Court

should affirm its final evasion determination.

### C. <u>CEK's Procedural Challenges Lack Merit</u>

   Finally, CEK raises several procedural challenges.  As described below, these arguments

are based on inaccurate assertions and do not establish that CEK lacked any opportunity to be

heard concerning evidence on which CBP relied in its determination.  As such, these arguments

do not offer a basis to overturn CBP's evasion determination.

### 1. <u>CBP Did Not Improperly Reject Record Evidence</u>

   CEK asserts that "various parties sought to provide evidence to CBP of actual production

of hangers by NWH" but that "CBP created artificial barriers to the filing of such information,

including filing limitations not contained in either the regulations or published guidance for the

filing of documents{.}"  Pl.'s Br. 3.  CEK's arguments on this issue focus on a set of

surveillance videos purportedly filming NWH's facility in Thailand.  Pl.'s Br. 28.

NWH submitted video surveillance footage on March 10, 2021, and on March 23–25, 2021.  CBP placed these videos on the record after NWH submitted the videos by email, as CBP requested, rather than through a file sharing platform that CBP could not access due to internet security protocols.  *See* TRLED Determination 30–31; *see also* P.R. 74–97 (videos).  After the April 2, 2021 deadline to submit voluntary factual information, both NWH and CEK made several attempts to submit additional surveillance videos, however, CBP rejected these videos as they were submitted after the April 2 deadline and they contained new factual information that did not rebut Voluntary Factual Information submitted by M&B.  *See* CBP Memo: NWH's Voluntary Factual Information at 2 (P.R. 56) (rejecting videos submitted by NWH on April 13 & 14); Rejection of CEK Rebuttal (P.R. 57) (rejecting videos submitted by CEK on April 9); CBP's Rejection of Rebuttal NFI Submissions (P.R. 60) (rejecting submission made by CEK on April 19, 2021).  CBP then granted CEK additional time to submit rebuttal voluntary factual information, which CEK did on April 27, 2021.  *See* CEK Rebuttal Factual Information (C.R. 34).  In CEK's April 27 submission, it again included several videos and indicated that the videos submitted were "identical to the March 23–25 videos submitted by NWH but are recorded on different dates and times from the March 23–25 videos."  *Id.*  CBP rejected this submission because it contained new factual information.  *See* Rejection of CEK Rebuttal (P.R. 57).

On April 29, CBP received a physical disk from NWH, which included the March 23–25, April 13 & 14, and April 27 videos, as well as additional videos.  *See* TRLED Determination at 31.  Although the disk had been mailed on March 19, 2021, prior to the April 2 deadline, the EAPA office did not receive it until April 29.  *Id.* at 33.  CBP rejected the submission as untimely and explained that its offices were closed and CBP's mail was processed centrally, which would result in delays.  *See* Rejection of NWH Video Files (P.R. 63).  CBP also noted that

the instructions in the RFI directed parties to submit information by email and that other interested parties had not been served with copies of the videos.  *Id.*

CBP's rejection of certain videos submitted by NWH and CEK on the record was reasonable.  *See* TRLED Determination at 32.  Pursuant to 19 C.F.R. § 165.23(c)(2), voluntary factual information submitted to CBP "must be submitted no later than 200 calendar days" after CBP initiates an investigation and "{v}oluntary information submitted after the 200th day after the initiation of the investigation will not be considered or placed on the administrative record{.}"  19 C.F.R. § 165.23(c)(2).  The applicable regulations allow for a party to request an extension no later than 3 business days before the applicable time period expires, unless there are "extraordinary circumstances" shown as to why the 3 business day rule could not be met.[14]  At no time did NWH submit an extension request to submit data after the April 2, 2021 deadline.  In addition, these submissions failed to comply with CBP's regulations requiring that all factual information and written arguments submitted to CBP must be simultaneously served on other interested parties.  *See* 19 C.F.R. § 165.23(c).

The Court has recognized that "{a}dministrative agencies have discretion in establishing and enforcing deadlines{.}"  *Aspects Furniture Int'l, Inc.*, 2022 WL 17249645, at \*9.  In *Aspects Furniture Int'l*, the Court considered whether CBP abused its discretion in rejecting an untimely filing, and the Court explained that it "considers the goal of the relevant statute, weighs the burden placed on the agency by accepting the late submission, and weighs the finality at the final results stage."  *Id.* at \*9.  The Court recognized that the deadlines imposed by the EAPA statute

---

[14] An "extraordinary circumstance" is, per the EAPA regulations, "an unexpected event that could not have been prevented even if reasonable measures had been taken."  19 C.F.R. § 165.5(c).  The EAPA regulations make clear that it is within CBP's reasonable discretion to determine what constitutes extraordinary circumstances, what constitutes good cause, and to grant or deny a request for an extension.

"to initiate an investigation, issue its determination, and enact interim measures" and the statute's limitation on the extension of the deadline for issuing a determination "suggest a Congressional intent that EAPA investigations should proceed in a timely manner." *Id.*  Given the clear congressional intent that CBP conduct its investigations in a timely manner, CBP reasonably rejected NWH's and CEK's untimely submissions.

CEK argues that "CBP should not have rejected the numerous high definition videos offered by CEK, and once it does so, CBP is precluded from taking adverse inferences because of the resolution quality and lack of number of videos."  Pl.'s Br. 3.  This argument fails because CBP's decision to apply adverse inferences, a decision that is in accordance with law, was based on CEK's failure to provide complete responses to CBP's requests for information, as described in Section III.A above, and is therefore unrelated to these videos submissions.

Moreover, as CBP described, the submitted surveillance videos, including the videos that were accepted on the record as timely, do not provide sufficient evidence that all hangers exported to the United States during the POI were of Thai origin.  *See* TRLED Determination 32–34.  CBP reasoned that, "{a}ssuming, *arguendo*, that all surveillance videos made by NWH were on the record of this investigation{,}" these videos only covered a 52-day period, which itself only covers 7% of the period of investigation.  *Id.*  CBP also found that both the accepted and rejected surveillance videos showed that NWH had operations on just 31 days of the 52-day period.  *Id.*  CBP also observed that "NWH submitted no narrative with its surveillance videos" and that "NWH did not in any way tie these videos to its books and records."  *Id.*  Finally, CBP concluded that "the videos do not make clear that hanger production is occurring other than right in front of the camera."  *Id.*

**2.  CBP Did Not Err By Relying on Confidential Information Not Available to Participating Parties**

CEK also asserts that CBP failed to provide adequate public summaries of confidential information that the agency placed on the record.  Pl.'s Br. 45–46.  CEK's challenge focuses on two documents – an Attaché Report prepared by HSI that was prepared prior to and independent of the EAPA investigation, and a market research report included as an exhibit to M&B's allegations.  CEK argues that CBP cannot rely on either report "as evidence contradicting NWH's actual production or capacity . . . to produce or as support for any determination applying adverse inferences."  Pl. Br. 46.  This argument fails.

CEK's argument concerning the HSI Attaché Report is based on two inaccurate assertions — that "CBP unlawfully failed to provide an adequate public summary" of the report and that CBP "improperly conducted a site visit before initiating that investigation."  *See* Pl.'s Br. 45.  However, CBP did send interested parties, including CEK, a public version of the HSI Attaché Report on January 29, 2021.[15]  *See* P.R. 101.  Moreover, the HSI Attaché Report concerns a site visit conducted not by CBP, but by the HSI Attaché in Thailand, that was conducted independently of the EAPA investigation.  *See* Memo Re: Adding Information to the Record and Synopsis of HSI Site Visit (C.R. 61).  The report therefore does not contain information on a site visit CBP conducted before it initiated this EAPA investigation, as CEK suggests.

---

[15] The public summary is included in the administrative record (P.R. 101), however, the cover email transmitting that document, was not included in the administrative record.  The government has attached that email to this briefing and asks that the Court take judicial notice of that email.  *See* Attachment 1 (January 29, 2021 email transmitting public summary of HSI Attaché Report sent to Matt Nakachi, CEK's former counsel, and other interested parties).  At the time of this administrative proceeding, CBP relied on email transmissions to interested parties to share administrative record documents.

CEK's claims concerning the HSI Attaché Report also lack merit. CBP's narrow redaction of confidential information in the public version of the HSI Attaché Report was generally consistent with the regulations at 19 C.F.R. § 165.4(a) and was sufficient to permit a reasonable understanding of the substance of that information. Redaction of confidential information is necessary in an EAPA proceeding as no statutory authority requires or authorizes CBP to disclose business confidential information under an administrative protective order similar to AD/CVD proceedings. *See Royal Brush Mfg., Inc. v. United States*, 483 F.Supp.3d 1306 (Ct. Int'l Trade 2020) ("EAPA does not require or establish a procedure for the issuance of an administrative protective order ('APO') akin to the procedure used in antidumping and countervailing duty proceedings or otherwise address Customs' management of confidential information."); *see also* 19 U.S.C. § 1677f(c)(1)(A) (APO procedure in AD/CVD proceedings). CEK has offered no argument that the public version of the HSI Attaché Report is inadequate. *See Royal Brush Mfg., Inc. v. United States*, 545 F.Supp.3d 1357, 1368 (Ct. Int'l Trade 2021) (rejecting plaintiff's challenges that public summaries were inadequate, noting that "Royal Brush ha{d} not shown that it was prejudiced by CBP's preparation of the public version{.}").

CBP's inclusion of the HSI Attaché Report on the administrative record of this case is likewise consistent with its regulations. After initiating the EAPA investigation, CBP learned that HSI, in July 2019, prior to the filing of M&B's allegations, made a site visit to NWH, unrelated to the EAPA investigation against CEK, and detailed this visit in a report. *Id.* CBP placed the report on the record of this investigation, as it is permitted to do under 19 C.F.R. § 165.5(a), which provides that "CBP will obtain information from its own files, from other agencies of the United States Government, through questionnaires and correspondence, and through field work by its officials." *Id.*; *see also Micron Tech., Inc. v. United States*, 117 F.3d

1386, 1394–95 (Fed. Cir. 1997) (an agency maintains "discretionary authority to determine the extent of investigation and information it needs"). As such, inclusion of the report is consistent with CBP's regulations. *See* TRLED Determination at 40.

Concerning the market research report, CEK argues that CBP "failed to require alleger to provide an adequate public version of the allegations, including the 'market research' report, depriving CEK of the ability to argue at the administrative level that the matter was impermissibly initiated." Pl.'s Br. 45. M&B submitted the market research report as a confidential exhibit to its allegation. *See* CEK Allegations, Conf. Exhibit 6 (BC-000634). In an EAPA investigation, "any interested party that makes a submission to CBP in connection with an investigation under this part, including for its initiation and administrative review, may request that CBP treat any part of the submission as business confidential information{.}" *See* 19 C.F.R. § 165.4(a). Although M&B did not provide a public summary of the market research report during the administrative proceeding, that report has now been filed as part of the administrative record to which CEK now has access.

CEK has not been prejudiced in any way by not receiving a public summary of the market research report during the administrative proceeding since CBP did not rely on that report in any of its determinations. As described above, although CBP described the market research report in its Initiation Notice, it did so in the context of extensive information suggesting evasion included in the allegation. CBP did not rely on the market research report in its evasion determination, or the administrative review of that determination. As discussed in Section II.A above, neither the applicable statute nor regulations offer a party under investigation a pre-initiation right to comment on CBP's decision to initiate an EAPA investigation. Because CEK had no pre-initiation right to comment on CBP's decision to initiate an investigation, and CEK

did not rely on the market report in its ultimate evasion determination, CEK was not prejudiced by not receiving a public summary of that report during the administrative proceeding.  By comparison, in *Aspects Furniture Int'l, Inc.*, the Court indicated that the administrative record in that case did not include a public summary of redacted information for the Verification Report, which the Court determined was problematic because CBP's final determination and the agency's administrative review of that determination "rely heavily on the Verification Report and cite to the specific section of the Verification Report{.}"  *Id.*, 2022 WL 17249645, at *18.

In support of its argument, CEK cites *Royal Brush Mfg., Inc. v. United States*, 483 F.Supp.3d 1294 (Ct. Int'l Trade 2020), however, that case is inapposite.  In *Royal Brush*, the Court remanded an EAPA determination when the importer had not been provided with public summaries of confidential information redacted from an Attaché Report conducted by CBP during the course of its EAPA investigation and a Verification Report, which the Court found did not give Royal Brush an "adequate opportunity . . . to respond to the evidence used against them{.}"  *Id.* at 1306.  However, here CBP did provide a public version of the HSI Attaché Report and therefore had an opportunity to respond to this evidence.  As to the market research report, *Royal Brush* is likewise distinguishable because in that case the Court stated that "{t}he lack of public summaries . . . are particularly concerning given CBP's reliance on those reports in its determination."  *Id.* at 1307.  However, here, CBP did not rely on the market research report in its evasion determination, or the administrative review of that determination.  As a result, CEK cannot show that it was harmed by not receiving a public summary of the market research report until the administrative record was filed with this Court, and this challenge should be dismissed.  *See, e.g.*, *Shinseki v. Sanders*, 556 U.S. 396, 409 2009) ("{T}he burden of

showing that an error is harmful normally falls upon the party attacking the agency's determination.").

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny CEK's motion for judgment on the agency record, sustain CBP's evasion determination, and enter judgment for the United States.

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| CEK GROUP LLC, | |
| Plaintiff, | Court No. 22-00082 |
| v. | CONFIDENTIAL VERSION |
| UNITED STATES, | |
| Defendant, | |
| and | |
| M&B METAL PRODUCTS COMPANY, INC. | |
| Defendant-Intervenor. | |

## **ORDER**

Upon consideration of CEK's motion for judgment on the agency record, defendant's response, and all other pertinent papers, it is hereby

ORDERED that CEK's motion is denied; and it is further

ORDERED that the final determination of the U.S. Customs and Border Protection is sustained in its entirety; and it is further

ORDERED that judgment is entered in favor of the United States.

Dated: _____       _____
New York, NY                                             Judge

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Court's Standard Chambers Procedure ¶ 2(B)(1), I hereby certify that this brief contains 13,688 words.  In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

<u>/s/ Elisa S. Solomon</u>
Elisa S. Solomon