**Slip Op. 23-69**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CEK GROUP LLC,** | |
| Plaintiff, | |
| v. | Before: Jane A. Restani, Judge |
| **UNITED STATES,** | Court No. 22-00082 |
| Defendant, | **PUBLIC VERSION** |
| **M&B Metal Products Company, Inc.,** | |
| Defendant-Intervenor | |

<u>**OPINION**</u>

Dated: May 2, 2023

[The court sustains Customs' final determination and final administrative decision pursuant to the Enforce and Protect Act finding evasion of duties on steel wire hangers.]

<u>David John Craven</u>, Craven Trade Law LLC, of Chicago, IL, for Plaintiff CEK Group LLC.

<u>Elisa S. Solomon</u>, International Trade Field Office, U.S. Department of Justice, of New York, NY, for Defendant United States of America.  With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC.  Of counsel on the brief was <u>Christopher Berridge</u>, Office of Chief Counsel, U.S. Customs and Border Protection, and <u>Jennifer L. Petelle</u>, Office of Chief Counsel, U.S. Customs and Border Protection, of Washington, DC.

<u>Frederick P. Waite</u> and <u>Kimberly R. Young</u>, Vorys, Sater, Seymour and Pease, LLP, of Washington, DC, for Defendant-Intervenor M&B Metal Products Company, Inc.

Restani, Judge:  Importer of steel wire hangers CEK Group LLC ("CEK") challenges the

final determination and final administrative decision made by the United States Customs and

Border Protection ("CBP").  CEK asserts that the Enforce and Protect Act ("EAPA"), 19 U.S.C.

§ 1517, investigation should not have been initiated, that CBP made procedural errors regarding

the rejection of evidence and failure to provide adequate public summaries, that adverse inferences

were improperly applied, and that the determination and decision by CBP are not supported by

substantial evidence.  The United States ("Government") refutes these claims and asks the court

to sustain CBP's evasion determination.

## BACKGROUND

On July 6, 2020, M&B Metal Products Company, Inc. ("M&B"), a domestic producer of

steel wire garment hangers, filed an EAPA duty evasion allegation asserting that CEK participated

in a scheme to transship wire hangers from China through Thailand into the United States.  EAPA

Duty Evasion Allegation Concerning Steel Wire Garment Hangers Imported from Thailand—

Importer: CEK Group LLC, C.R. 5, P.R. 5 (July 6, 2020) ("Allegation").  M&B alleged that CEK

and three other U.S. importers, working with Thai exporter and manufacturer NWH Manufacture

Company Limited ("NWH"), evaded an antidumping order on steel wire hangers from China.

Allegation at 2–3, Ex. 1; see also Notice of Antidumping Duty Order: Steel Wire Garment Hangers

from the People's Republic of China, 73 Fed. Reg. 58,111 (Dep't Commerce Oct. 6, 2008) ("AD

Order").

On September 14, 2020, CBP's Trade Remedy Law Enforcement Directorate ("TRLED")

initiated the investigation of CEK for EAPA Case Number 7501.  Initiation of Investigation for

EAPA Case Number 7501, C.R. 17, P.R. 29 (Sep. 14, 2020) ("Initiation Memo").  In analyzing

the allegation submitted by M&B, TRLED determined that the materials that M&B provided

Court No. 22-00082                                                                                        Page 3
**Public Version**

"reasonably suggest[] that covered merchandise has entered into the customs territory of the United States by means of evasion." <u>Initiation Memo</u> at 1.

On December 11, 2020, TRLED determined that reasonable suspicion existed that the hangers were in fact manufactured in China, and imposed interim measures upon CEK. <u>EAPA Consolidated Investigation 7501: Notice of Determination as to Evasion</u> at 2, C.R. 36 (Sept. 16, 2021) ("<u>Evasion Determination</u>"). One week later, TRLED issued the Notice of Initiation of Investigation. <u>Notice of Initiation of Investigation and Interim Measures: Consolidated EAPA Case 7501</u>, C.R. 25, P.R. 39 (Dec. 18, 2020). TRLED sent CEK a Request for Information ("RFI") on January 28, 2021, and a supplemental RFI one month later. <u>EAPA Consolidated Case 7501: Request for Information from CEK Group LLC</u> at 1, C.R. 1, P.R. 1 (Jan. 28, 2021); <u>EAPA Consolidated Case 7501: Supplemental Request for Information from CEK Group LLC</u> at 1, C.R. 32, P.R. 51 (Feb. 26, 2021). CEK responded to the RFI but failed to respond to the supplemental RFI. <u>CEK – RFI Response</u>, C.R. 31, P.R. 49 (Feb. 25, 2021) ("<u>CEK RFI Resp.</u>"); <u>TRLED – CEK Non-Response to Supp RFI</u>, P.R. 54 (Mar. 10, 2021) ("<u>CEK Supp. RFI Non-Resp.</u>"). Additionally, TRLED sent an RFI to NWH on January 27, 2021, and, after two prior responses were rejected for deficiencies in the filing, TRLED accepted a response on March 10, 2021. <u>EAPA Consolidated Case 7501: Request for Information from the Foreign Producer</u> at 1, C.R. 26, P.R. 41 (Jan. 27, 2021) ("<u>NWH RFI Request</u>"); <u>NWH – RFI Response</u>, C.R. 33, P.R. 54 (Mar. 10, 2021) ("<u>NWH RFI Resp.</u>"); <u>see also</u> Evasion Determination at 3.

During March and April of 2021, M&B and NWH each voluntarily submitted factual information. <u>Evasion Determination</u> at 4. TRLED accepted both submissions and placed them on the record. <u>Id.</u> CEK sought to submit information rebutting M&B's submission, and after two

previous submissions were rejected for failing to contain actual rebuttal information, TRLED

accepted the rebuttal information.  Id.  Finally, TRLED rejected several submissions from NWH,

including video evidence mailed to TRLED, for being untimely.  Id.  With the record complete,

CEK and M&B each submitted written arguments and rebuttal arguments.  CEK Written

Argument, C.R. 35, P.R. 64 (May 10, 2021); M&B Written Argument, P.R. 65 (May 10, 2021);

CEK Rebuttal Argument, C.R. 34, P.R. 66 (May 25, 2021); M&B Rebuttal Argument, P.R. 67

(May 25, 2021).

   After reviewing the record evidence and relevant arguments, TRLED issued its notice of

determination as to evasion on September 16, 2021.  Evasion Determination.  CEK submitted a

timely request for review, and CBP's Office of Regulations and Rulings ("ORR"), after reviewing

the determination de novo, issued a decision affirming TRLED's determination of evasion.  See

Administrative Review Determination of Evasion Decision, C.R. 69, P.R. 114 (Jan. 28, 2022)

("Admin. Review").  CEK filed this action in the court, challenging the TRLED determination and

ORR decision.  See Compl., ECF No. 2 (Mar. 11, 2022).

<b>JURISDICTION & STANDARD OF REVIEW</b>

   The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1517(g).  The

EAPA requires that the court determine whether a determination issued pursuant to 19 U.S.C.

§ 1517(c) or a review pursuant to 19 U.S.C. § 1517(f) was conducted "in accordance with those

subjections" by examining whether CBP "fully complied with all procedures under subsections

(c) and (f)" and "whether any determination, finding, or conclusion is arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  19 U.S.C. § 1517(g)(2)(A)-(B).

While the agency bases its determination and decision on substantial evidence and the court

reviews the agency's actions to assess whether they are arbitrary and capricious, "both standards require an assessment based on a reasonableness standard." <u>Ad Hoc Shrimp Trade Enf't Comm. v. United States</u>, Slip Op. 23-61, at *11 (CIT Apr. 26, 2023) (citing <u>Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. Of Governors of Fed. Rsrv. Sys.</u>, 745 F.2d 677 683–84 (D.C. Cir. 1984)).  "The court's review of Customs' determination as to evasion may encompass interim decisions subsumed into the final determination." <u>Vietnam Firewood Co. Ltd. v. United States</u>, 44 CIT __, __, 466 F. Supp. 3d 1273, 1284 (2020).

## DISCUSSION

### I.   Customs' Initiation of the Investigation

CEK contends that CBP improperly initiated the EAPA investigation.  Pl. CEK Group LLC, Mem. in Supp of its R. 56.2 Mot. for J. on the Agency Record at 10–20, ECF Nos. 33–34 (Sept. 12, 2022) ("CEK Br.").  CEK asserts that the allegation submitted by M&B did not contain "sufficient" information to reasonably suggest that CEK was importing covered merchandise through evasion.  CEK Br. at 11.  The United States argues that M&B's allegation presented "robust information" to suggest evasion in the importation of wire hangers.  Def. United States, Resp. Oppo. To Pl.'s Mot. for J. on the Agency Record at 8, 13–23, ECF Nos. 38–39 (Jan. 13, 2022) ("Gov. Br.").  The Government also contends that CEK cannot challenge the initiation of an investigation.  Gov. Br. at 11–13.

Pursuant to 19 U.S.C. § 1517(b)(1), CBP "shall initiate an investigation if the Commissioner determines that the information provided" in an allegation by a domestic manufacturer "reasonably suggest that covered merchandise has been entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(b)(1).  The necessary

Court No. 22-00082                                                                    Page 6
Public Version

information should be "reasonably available to the interested party to support its allegation."  19

C.F.R. § 165.11(b)(6).  "Reasonably suggest" is not further defined in the statute, however, it is a

standard the Government must follow, and is therefore challengeable.  19 U.S.C. § 1517(b)(1); 5

U.S.C. § 702.

        In Leco Supply, Inc. v. United States, the court found that CBP properly assessed the data

presented in an allegation to reasonably suggest that Leco was importing merchandise through

evasion.  46 CIT __, __, 2023 WL 1434182 at *5 (2023).  The allegations in Leco, which are not

entirely dissimilar to those asserted here, noted a lack of employees at the alleged manufacturing

factory as well as significant changes in imports from Laos and Vietnam following an imposition

of new AD/CVD Orders.  Id.  CBP determined that these factors reasonably suggested that the

covered merchandise was entering the United States through evasion.  Id.  These facts were

considered "adequate" by the court to demonstrate CBP's determination was not arbitrary,

capricious, or an abuse of discretion.  Id.

        In its brief, the Government argues that although "reasonably suggest" is not defined in the

statute, legislative and judicial sources show that the phrase implies a threshold, initial finding as

opposed to a higher standard, such as substantial evidence.  Gov. Br. at 12 n.5.  The Government

points to 21 U.S.C. § 360i, administered by the Food and Drug Administration, which requires a

manufacturer or importer to report "information that reasonably suggests" that a device it markets

may contribute to or has malfunctioned in such a way as to cause death or injury.  Id., see also 21

U.S.C. § 360i(a)(1).  The Government asserts that "reasonably suggests" in this context is used to

indicate a threshold issue rather than a final determination, and that the language in § 1517(b)(1)

should be read in the same way.  Gov. Br. at 12 n.5.  The Government also contends that Terry v.

Court No. 22-00082                                                                      Page 7
**Public Version**

Ohio's "reasonable suspicion" standard should inform the reading of § 1517(b)(1) and that Terry

weighs in favor of reading the phrase to mean initial findings without the need for substantial

evidence. Id.; see also Terry v. Ohio, 392 U.S. 1, 21, 30 (1968).

CEK agrees that Terry v. Ohio's specific and objective bases for reasonable suspicion

should be used, but that these standards have not been met and cites the court's interpretation of

19 U.S.C. §1677b(b) in AL Tech Specialty Steel Corp. v. United States, 6 CIT 245, 246–47, 575

F. Supp. 1277, 1280–81 (1983), CEK Reply Br. at 5–7. AL Tech interpreted § 1677b(b)'s phrase

"reasonable grounds to believe or suspect" to hold that the government did not err in finding a

generalized press release regarding European steel, previous antidumping and countervailing duty

petitions, and the public summary of the alleged manufacturer's International Trade

Administration's ("ITA") review questionnaire insufficiently specific and objective to compel the

ITA to initiate an antidumping duty investigation. AL Tech, 575 F. Supp. at 1279–80.

Here, the court need not choose between the competing interpretations of "reasonably

suggests," in § 1517(b)(1), if there is actually a meaningful difference between them, as the

voluminous evidence provided by M&B's allegation meets both the Government's and CEK's

proposed standards of reasonable suggestion.[1]  In determining that an investigation should be

---

[1] To be clear, the court does not necessarily endorse either party's approach. The Supreme Court has long held that the reasonable suspicion needed to initiate investigations, some of which are invasive enough as to potentially violate the Fourth Amendment, varies from statute to statute. See Marshall v. Barlow's, Inc., 436 U.S. 307, 321 (1978) ("The reasonableness of a warrantless search . . . will depend upon the specific enforcement needs and privacy guarantees of each statute."); see also Camara v. Mun. Ct. of City & Cnty. of San Francisco, 387 U.S. 523, 539 (1967) ("[R]easonable legislative or administrative standards . . . will vary with the municipal program being enforced . . . . [R]easonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably

Court No. 22-00082                                                                                              Page 8
**Public Version**

initiated, CBP assessed the totality of the circumstances and evidence that M&B provided in its

allegation and found that the circumstances reasonably suggested that CEK was importing wire

hangers from NWH through evasion.  Initiation Memo at 5.  Among the evidence considered were

(1) NWH's standard industrial classification showing that NWH self-identified as a company that

sells wholesale goods on a fee or contract basis, which was not likely the kind of company that

would produce hangers, (2) a foreign market research report, which showed import data suggesting

"trading relationships" between NWH and the alleged transshipping Indian company Kaylee and

Chinese company Shaoxing Mahsheng, (3) evidence that CEK has the same address and owner as

AB MA Distribution Corporation, which imported hangers from NWH and the alleged

transshipping Indian company Kaylee, (4) a bill of lading that shows that NWH imported hangers

from [[                          ]] a company located in China,[2] and (5) an investigation into CEK's

alleged manufacturing site with photos showing that there was little activity at the warehouse.[3]

Initiation Memo at 2–4.

---

restricted search warrant.").  Here, there are no Fourth Amendment concerns as in Terry v. Ohio
and its progeny, nor are there the significant factors of health and human safety present as with
the Federal Food and Drug Administration statute.  Instead, CBP is tasked with enforcing U.S.
antidumping and countervailing duty laws to protect U.S. industry, and deference is given in
accordance with this goal.

[2] CEK argues that the provided document is illegible, that the shipment is before the period of
investigation, and that the quantity of product only totaled about [[      ]] of shipments to the
United States.  Though the document does have legibility issues, it is possible to make out that
the document itemizes a shipment from a company named [[                                          ]]
to NWH in Thailand.  For the purposes of establishing a reasonable suggestion of evasion, the
document establishes a relationship between the two companies and a shipment of wire hangers
from China to NWH in Thailand.  Allegation, Ex. 5; CEK Br. at 14–15.  The date in question is
illegible.  Allegation, Ex. 5.

[3] CEK maintains that the photos do not establish little activity.  However, giving due deference
to Commerce's factual findings, such a conclusion appears neither arbitrary nor capricious.  CEK
Br. at 25–27; Allegation, Ex. 6.

*Confidential Information Omitted*

Court No. 22-00082                                                                                    Page 9
**Public Version**

As CEK admits, "the standard for initiation [of an EAPA investigation] is low." CEK

Group LLC, Reply to Resp. of Def. and Def-Intervenor at 3, ECF No. 41 (Feb. 15, 2023) ("CEK

Reply Br."). The court need not assess the validity of every piece of evidence provided.[4] Taken

together, the evidence specified above, along with many other materials, more than meets the

standard of reasonably suggesting evasion of antidumping and countervailing duties by CEK.

## II.    CEK's Procedural Challenges

CEK raises two procedural challenges before the court. First, CEK argues that TRLED

improperly rejected NWH's video evidence. CEK Br. at 28. Second, CEK asserts that TRLED

failed to provide adequate public summaries of the Attaché Report prepared by Homeland Security

Investigations ("HSI")[5] and the allegations submitted by M&B—specifically the market research

report. CEK Br. at 45. The Government responds that only improperly submitted video evidence

was rejected, that the public version of the Attaché Report redacted only limited information

without preventing a reasonable understanding of the substance of the document, and that CBP did

not rely on the market research report in either its intermediate determination or its final decision.

---

[4] CEK contends that many pieces of material discussed by M&B and considered by Commerce
were improper. For example, CEK refutes that NWH's failure to submit financial data to the
Thai Government would be a reason to suggest evasion. CEK Br. at 15–16. This is
unconvincing. Some of the connections made by Commerce and M&B's allegation may be
more tenuous, for example, two companies having owners with the same family name who live
in the same district. CEK Br. at 19–20; Initiation Memo at 4; Allegation at 8. The court need
not speak to the reliability of such contentions, as other, more substantial evidence reasonably
suggests evasion. Potentially bad evidence does not invalidate good evidence.

[5] After the initiation of the investigation CBP added a memorandum to the administrative record
concerning a site visit of NWH's facilities conducted by HSI, a subcomponent of Immigration &
Customs Enforcement within CBP. See Memo Re: Adding Information to the Administrative
Record of Consolidated EAPA Case 7501, C.R. 61, P.R. 101 (Dec. 18, 2020) ("Attaché
Report").

Court No. 22-00082                                                              Page 10
**Public Version**

Gov. Br. at 37–43.

###    A.  Rejected Video Evidence

19 C.F.R. § 165.23 governs the submission of factual information during an evasion

investigation.    Under the regulation, parties must make voluntary submissions of factual

information "no later than 200 calendar days after CBP initiated the investigation." 19 C.F.R.

§ 165.23(c)(2).  Voluntary submissions after the 200th calendar day are not considered or placed

on the administrative record.  Id.  If factual information is placed on the record prior to the 200th

calendar day, parties to the investigation may provide rebuttal information responding to that new

information within ten calendar days.  Id.  All submissions, whether voluntary, in response to a

CBP request for information, or in rebuttal, must be submitted via "an email message or through

any other method approved or designated by CBP . . . ."  See id. § 165.23(c)(1), (2).  For good

cause, a party may submit a request for extension.  19 C.F.R. § 165.5(c)(1).

NWH submitted video evidence throughout March 2021 via email, all of which TRLED

accepted and placed on the record.  Evasion Determination at 3–4.  After April 2, 2021, which

marked the final day parties were permitted to submit factual information, both NWH and CEK

made several attempts to submit additional videos.  Id.  TRLED rejected these videos because they

were submitted after the deadline and did not rebut factual information voluntarily submitted by

M&B.  Consolidated EAPA Case 7501: New Factual Information Submitted by NWH at 1, P.R.

56 (Apr. 15, 2021); EAPA 7501: Rejection of Rebuttal NFI at 1, P.R. 57 (Apr. 15, 2021); EAPA

7501: Rejection of Rebuttal NFI Submissions at 1, P.R. 60 (Apr. 22, 2021).  On April 29, 2021,

TRLED received a physical disk with additional video evidence that NWH had mailed on March

19, 2021.  EAPA 7501: Rejection of Video Files, P.R. 63 (April 30, 2021).  In the rejection,

TRLED asserted that NWH had mailed the disk against the advice of CBP officials as CBP had advised NWH not to physically mail information because CBP's offices were closed, that central processing would delay the package, and that the RFI instructions stated that submissions must be submitted via email.  Id.

Although CEK asserts the rejection of NWH's mailed disk was improper, CEK cites no authority to support its position.  CEK Br. at 28–29.  TRLED's actions are reasonable and clearly in accordance with its regulation, and without specific arguments as to why the regulation may be invalid, the court sees no reason to evaluate the regulation itself.

## B.  Adequacy of the Public Summaries

19 C.F.R. § 165.4(a) provides procedures for when parties request business confidential treatment for a document and any public summary of that document.  The regulation requires any document containing business confidential information to file a public version of the submission that "contain[s] a summary of the bracketed information in sufficient detail to permit a reasonable understanding of the substance of the information."  Id. § 165.4(a)(2).  In Royal Brush Manufacturing, Inc. v. United States, the court found the lack of public summaries accompanying the Attaché Report "particularly concerning given CBP's reliance on those reports in its determination."  43 CIT __, __, 483 F. Supp. 3d 1294, 1307 (2020).  The court in Royal Brush remanded the matter to CBP to address and remedy the lack of public summaries and provide the plaintiff with an "opportunity to participate on the basis of information that it should have received during the underlying proceeding."  Id. at 1308.

CEK argues that at the time the Attaché Report was drafted, CBP had not yet initiated an investigation pursuant to 19 U.S.C. § 1517(b)(1) and therefore lacked the authority to collect

information.  CEK Br. at 45.  This argument fails because the site visit was conducted prior to the

allegation by M&B and was independent of the EAPA investigation.  See Attaché Report at 3.

CEK further argues that CBP failed to provide an adequate public summary of the report but does

not show how the lack of an adequate summary resulted in prejudice.  Id.  CBP's redaction of the

Attaché Report complies with 19 C.F.R. § 165.4, which requires redaction of confidential

information such as the names and phone numbers of employees, the number and weight of

shipments, and photos and videos of the site.  19 C.F.R. § 165.4(a)(2).  While CBP did not provide

summaries detailed enough to determine a close approximation of the redacted information, the

redacted report did retain enough context and did provide sufficient summaries to determine what

type of information was redacted.  E.g., Attaché Report at 4 ("When asked how many wire hangers

NWH manufactures per day/per month, Mr. Tu stated [  ] cartons per day average."); Attaché

Report at 1, 15 ("Photographs from the site visit have been provided in Attachment 2."  "Business

Confidential in its entirety; Not susceptible to public summarization").  Additionally, neither

TRLED nor ORR substantially rely on Attaché Report, distinguishing this case from Royal Brush.

See Evasion Determination at 23; see generally Admin. Review.  Absent specific arguments as to

how the redaction and summarization resulted in prejudice, the court finds no reason to order any

relief with regard to CBP's public summary of the Attaché Report.

Finally, CEK argues that M&B failed to provide an adequate public version of the

allegations, including the market research report.  CEK Br. at 45.  While CBP did refer to the

market research report in the Initiation Memo, it did not rely on the report in its evasion

determination or the subsequent review.  Initiation Memo at 3; see generally Evasion

Determination; Admin. Review.  CEK argues it was prejudiced by the lack of an adequate public

version, as the absence prevented it and NWH from responding to the evidence presented.  This

argument fails.  The only time CBP utilized the report was to initiate the investigation, a pre-

investigatory step.  The EAPA does not permit pre-investigation comments by the subjects of

potential investigations.  "Agency action will be 'set aside "only for substantial procedural or

substantive reasons."'"  Leco Supply, Inc., 2023 WL 1434182 at *10 (quoting Intercargo Ins. Co.

v. United States, 83 F.3d 391, 394 (Fed. Cir. 1996)).  Here, CEK was not prejudiced as CBP did

not rely on the market research report in the investigation.  Consequently, the court denies relief

on this basis.

## III.     Customs' Evasion Determination

CEK argues that TRLED improperly took adverse inferences in the absence of any gap in

the record, and that the record is devoid of substantial evidence of evasion.  CEK Br. at 43.  The

Government counters that CEK and NWH failed to cooperate to the best of their abilities, creating

a gap and justifying adverse inferences, and that substantial evidence supports a finding of evasion.

Gov. Br. at 24, 31.  The court finds that substantial evidence supports the finding of evasion, and

the determination and review were not arbitrary and capricious.

### A.  The Gap in the Record and the Application of Adverse Inferences

It is undisputed that during the investigation CEK and NWH failed to respond to TRLED's

RFIs in their entirety.  CEK Br. at 44.  CEK failed to respond to any of the sections in the

Supplemental RFI titled "Accounting/Financial Practices" and "Sales Reconciliations" and only

answered some of the questions in "corporate structure" and "Procurement and Sales Practices."

Evasion Determination at 9; CEK RFI Resp. at 7–8, 10–11, 13 –14, 16; CEK Supp. RFI Non-Resp.

These questions, CBP contends, are standard in EAPA investigations and the other importers

Court No. 22-00082                                                                                          Page 14
**Public Version**

investigated received identical RFIs.  <u>Evasion Determination</u> at 9; <u>see, e.g.</u>, <u>EAPA Consolidated</u>

<u>Case 7501: Request for Information from D&J Trading Inc.</u>, C.R. 2, P.R. 2 (Jan. 28, 2021).  NWH

similarly failed to fully respond to the RFI, answering only one of twenty-nine questions about its

accounting practices, and few of the questions in the "Sales and Production Reconciliations"

section.  <u>Evasion Determination</u> at 10–22; <u>NWH RFI Resp.</u>[6]

      CEK asserts that any questions not addressed were irrelevant and not necessary to the

analysis, and thus TRLED was barred from applying adverse inferences.  CEK Br. 43–45.

According to CEK, it and NWH provided sufficient information to establish the capacity and

production occurring at NWH's facility; therefore, there were no gaps in the record.  <u>Id.</u>  CEK

makes two incorrect assumptions: first that adverse inferences as defined by § 1517(c)(3) can only

be applied when there is a gap in the record; and second, that TRLED may only ask questions

directly relating to production and capacity.

      CEK contends that the term "adverse inferences" in 19 U.S.C. § 1517(c)(3) should be read

<u>in pari materia</u> with the term "adverse inferences" in 19 U.S.C. § 1677e.  CEK Br. at 43–44.  While

the two statutes are similar, they have key differences in wording and structure and must first and

foremost be read for their plain meaning.  Section 1517(c)(3) provides that CBP may utilize

adverse inferences with respect to an interested party, importer, foreign producer or exporter, or

foreign government where such party "has failed to cooperate by not acting to the best of [its]

ability to comply with a request for information."  19 U.S.C. § 1517(c)(2)(A), (c)(3)(A).

---

[6] CBP gave NWH instructions on how to indicate that a question was not applicable.  <u>NWH RFI</u>
<u>Request</u> at 5.  Nonetheless, NWH broadly failed to so indicate.  <u>Evasion Determination</u> at 11–22;
<u>see generally</u> <u>NWH RFI Resp.</u>

Additionally, adverse inferences may be used "without regard to whether another person involved in the same transaction or transactions under examination has provided the information sought." See 19 U.S.C. § 1517(c)(3)(B)); see also All One God Faith, Inc. v. United States, 45 CIT __, __, 589 F. Supp. 3d 1238, 1250–51 (2022). Ergo, whether a gap exists is not necessarily determinative.[7]

Further, CBP has the authority to collect and verify additional information that is "necessary to make the determination." 19 U.S.C. § 1517(c)(2). It is not for CEK or NWH to decide which information and questions are necessary to the investigation, nor may CEK or NWH communicate their objection by refusing to respond to TRLED. Similar questions were asked of the other parties to the investigation, and no information has been presented to show that the questions were an unreasonable investigatory method or were peculiar in any way.[8] Thus, the court concludes that TRLED was reasonable in determining that CEK and NWH were uncooperative and that adverse inferences were applied in accordance with the statute.

## B. Evidence of Evasion and the TRLED Determination and ORR Decision

CEK contends that the administrative record supports a finding that NWH produced the steel wire hangers exported to the United States. CEK Br. at 32–33. In support of its contention,

---

[7] Of course, if information provided by another party so undermines the determination that it is rendered arbitrary, the determination cannot stand. That is not the case here.

[8] For example, CEK provided no response to the question "[p]rovide a detailed narrative explaining the financial accounting practices used to account for assets, liabilities, equity, income, and expenses," nor to the question "[p]rovide the following financial records for the two most recently completed fiscal years plus the current fiscal year to date, preferably in electronic format such as Microsoft Excel." CEK RFI Resp. at 7. Similarly, NWH failed to answer the question "[p]rovide a detailed narrative explaining the cost accounting practices regarding raw materials inventories, work-in-progress, finished goods inventories, and cost of goods sold . . . ." NWH RFI Resp. at 16.

CEK points to evidence such as documents establishing NWH's production during the period of investigation ("POI") and overall production capacity, as well as an analysis comparing the weight of raw materials imported to the weight of the completed wire hangers.  CEK Br. at 31–39.  The Government agrees that NWH has the capacity to produce wire hangers but asserts that CBP was unable to verify actual production from business records or theoretical production capacity, as NWH failed to answer numerous questions including the make and model numbers of the hanger making machines.  Evasion Determination at 24; Gov. Br. at 36–37.  Additionally, the Government asserts that any analysis comparing the weight of imports to exports from Thailand would not be probative, as "imports" may have included goods other than raw materials, such as hangers or semi-finished hangers from China, which are covered by the Antidumping ("AD") Order.  Gov. Br. at 36;[9] see also infra n.10.

In the Evasion Determination, TRLED utilized several factors to determine that evasion may have occurred.  Primarily, TRLED relied on information, corroborated by the Thai government and NWH itself, indicating that NWH purchased Chinese-origin hangers covered by the AD Order.  Evasion Determination at 50.  Additionally, the Thai government provided

---

[9] In its RFI response, NWH indicated that it imported semi-finished hangers from China during the POI.  Evasion Determination at 35 (citing NWH RFI Resp., Exhibit 8.3); see also NWH RFI Resp.  The Government argues these semi-finished hangers are covered by the AD Order, relying on a decision from the Department of Commerce ("Commerce") that found that semi-finished hangers made by two Vietnamese companies were subject to the AD Order.  See Gov. Br. at 36; see also Admin. Review at 9 (citing Steel Wire Garment Hangers from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order, 76 Fed. Reg. 66,895 (Dep't Commerce Oct. 28, 2011)).  While it is unclear that the semi-finished hangers imported into Thailand by NWH are identical to those examined by Commerce in 2011, CEK does not argue that any semi-finished hangers imported into Thailand by NWH would not be covered by the AD Order.  See CEK Br. at 37; see also Evasion Determination at 35–36.

information that indicated NWH could not begin production in Thailand until November 2019, after the POI had begun.  Id.  Finally, TRLED determined that NWH's raw material purchase documents were falsified.  See Evasion Determination at 25–29, 50.[10]

Similarly, in its de novo review of the Evasion Determination, ORR pointed to the dearth of information on the record regarding purchase orders and translated production records, which resulted in CBP's inability to trace CEK's imports through the production process in Thailand. Admin. Review at 7–8.  Unable to trace the production, ORR relied on invoices and packing lists from NWH demonstrating the importation of semi-finished wire hangers covered by the AD Order. Id. at 9.[11]  Moreover, ORR found that although "the record indicates that some wire hanger

---

[10] To support this conclusion, TRLED relies on the information from NWH's RFI.  First, while record evidence indicates NWH had five suppliers of steel wire, three from China and two from Thailand, NWH omitted any mention of two Chinese and one Thai supplier in its RFI response. Evasion Determination at 25–27; see NWH RFI Resp., Ex. 8.1, Ex. 8.3.  Moreover, the Chinese supplier's invoices for steel wire have significant differences between invoices listing a [[

]] address and those listing addresses in mainland China.  Evasion Determination at 27. For example, the [[              ]] invoices are more detailed and comport with the public information on the supplier's website, whereas the mainland China invoices are less detailed, formatted differently, and have inconsistent width of the "shipping mark column."  Evasion Determination at 27; compare NWH RFI Resp. at 274 ("Invoice TC19014") and NWH RFI Resp. at 255 ("Invoice TC19013") with NWH RFI Resp. at 324 ("Invoice CL191104").  TRLED determined that it was "unusual for a company headquartered in [[              ]] to have these kinds of errors on their invoices, especially with respect to" its own information.  Evasion Determination at 27.  Additionally, TRLED noticed several errors that appeared on the invoices from two different Chinese suppliers that TRLED determined were "highly unlikely to be a coincidence."  Id. at 28.  One such error is a space missing after the sub-district name Thackham and Bangpakong being misspelled as Bankpakong.  Id.; see e.g., Invoice TC19013; NWH RFI Resp. at 231; see also Invoice CL191104.  Given these examples and TRLED's experience interpreting these types of documents, the court finds TRLED's conclusion that the invoices were falsified to be reasonable.

[11] It appears undisputed that prior to the POI NWH imported millions of wire hangers from China.  Attache Report at 48.  CEK argues NWH imported only a small quantity of wire hangers from China during the POI.  Admin. Review at 9; CEK Br. at 15.  ORR, however, addressed this

Court No. 22-00082                                                                Page 18
**Public Version**

production likely occurred at NWH, there is not enough to demonstrate that NWH produced any,

let alone all, of the wire hangers exported to CEK in the United States." Id. at 10.[12]  Finally, ORR

decided that even though "the application of adverse inferences is unnecessary to [its] finding of

substantial evidence of evasion, [TRLED]'s decision to utilize adverse inferences in the September

16 Determination was warranted." Id. at 11.

It is clear that CBP examined the relevant data and articulated a satisfactory explanation

for its decision, irrespective of the application of adverse inferences.  The court finds that CBP

was reasonable in concluding that there was substantial evidence of evasion given that covered

merchandise was imported into Thailand by NWH, and that there was a lack of evidence

establishing sufficient production to meet the imports into the United States.

## CONCLUSION

For the foregoing reasons, the court sustains CBP's final determination of evasion.

Judgment will enter accordingly.

                                                    /s/      Jane A. Restani
                                                    Jane A. Restani. Judge

Dated: May 2, 2023
        New York, New York

---

argument as "[t]here is sufficient evidence of NWK's [sic] sourcing Chinese-origin semi-
finished hangers during the POI, and insufficient evidence to establish that the claimed Thai-
origin entries were actually manufactured in Thailand (without the use of these Chinese-origin
materials)." Admin. Review at 9.
[12] To make this decision, ORR relied heavily on NWH's RFI Response.  See Admin. Review at
7–9.